## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**OCHSNER CLINIC FOUNDATION**                                   **CIVIL ACTION**

**VERSUS**                                                      **NO. 15-2313**

**LEXINGTON INSURANCE COMPANY**                                 **SECTION: "G"(2)**

## ORDER

    In this litigation, Plaintiff Ochsner Clinic Foundation ("Ochsner") alleges that Defendant Lexington Insurance Company ("Lexington") breached its insurance policy by failing to pay additional amounts owed to Ochsner, and that Lexington acted in bad faith during the adjustment process.[1] Pending before the Court is Lexington's "Motion for Partial Summary Judgment Precluding Damages and Derivative Penalties under LA. R.S. § 22:1973."[2] Having reviewed the motion, the memoranda in support, the memorandum in opposition, the record, and the applicable law, the Court will deny the motion.

## I. Background

### A.    *Factual Background*

    In this case, Ochsner alleges that Lexington sold a Certificate of Property Facultative Reinsurance ("certificate") to Ochsner for the term of May 31, 2011, through May 31, 2012.[3] The certificate made Lexington the reinsurer of Ochsner System Protection Company's ("OSPC") all-risks Commercial Property Policy ("Policy").[4] The Policy covered a former warehouse located at

---

[1] *See* Rec. Doc. 1-1; Rec. Doc. 11 at 2–3.

[2] Rec. Doc. 60.

[3] Rec. Doc. 1-1 at 2.

[4] *Id.*; Rec. Doc. 68-2 at 3.

1401 Jefferson Highway that Ochsner was repurposing to serve as an expanded internal medicine practice.[5] On June 10, 2012, construction on the building began and was scheduled to be completed by June 2012.[6] On August 24, 2011, a portion of the building's roof collapsed during the renovation, causing property damage and delaying the clinic's opening.[7] Ochsner argues that this property damage and subsequent business income losses are covered by the Policy.[8]

Afterwards, Ochsner made a claim under the Policy for indemnification of the losses it alleges to have suffered as a result of the roof collapse.[9] According to Ochsner, on September 23, 2011, Lexington informed Ochsner that it was taking "full control of the investigation, defense, adjustment, and settlement of any claim."[10] Ochsner states that by doing so, OSPC did not have any role in handling Ochsner's insurance claim, and that Lexington became, "for all practical and legal purposes, the direct insurer of Ochsner."[11]

Ochsner argues that the Lexington's subsequent tactics, disputes, and arguments regarding the Policy coverage unnecessarily delayed work on the collapsed building, increased the cost of the repurposing project, and caused Ochsner to suffer further business interruption losses.[12] Ochsner also contends that Lexington violated the Louisiana Policyholder Bill of Rights by

---

[5] Rec. Doc. 1-1 at 2; Rec. Doc. 68-2 at 4.

[6] Rec. Doc. 60-1 at 4.

[7] Rec. Doc. 1-1 at 2.

[8] *Id.*

[9] *Id.*; Rec. Doc. 68-2 at 4; Rec. Doc. 60-1 at 5.

[10] Rec. Doc. 1-1 at 2.

[11] *Id.* at 3.

[12] Rec. Doc. 1-1 at 4.

refusing to give Ochsner copies of requested documents used during Lexington's adjustment of Ochsner's claims.[13]  Ochsner alleges that Lexington has still not paid the full amount of Ochsner's property damage claim or business interruption losses claim.[14]  Accordingly, Ochsner argues that Lexington has breached its obligations under the Policy.[15]  Moreover, Ochsner asserts that Lexington's actions, such as allegedly prolonging the investigation, adjustment, and payment process, amount to bad-faith conduct in violation of La. Rev. Stat. §§ 22:1892 and 22:1973.[16] Ochsner contends that this bad-faith conduct entitles it to additional damages and penalties.[17] Lexington, by contrast, asserts that it timely investigated, adjusted, and paid undisputed amounts of losses in Ochsner's claim as soon as Lexington learned of the claim.[18]  Lexington contends that it consistently worked with Ochsner to resolve any disputes over the scope of coverage while continuing to make payments throughout the adjustment process.[19]

### B.    Procedural Background

On June 26, 2014, Ochsner filed a Petition for Damages in the 24th Judicial District Court for the Parish of Jefferson, State of Louisiana.[20]  On June 25, 2015, Lexington removed the case to this Court after Ochsner voluntarily dismissed the only non-diverse defendant, OSPC, and

---

[13] *Id.* (citing La. R.S. § 22:41).

[14] *Id.* at 4–5.

[15] *Id.* at 5.

[16] *Id.*

[17] *Id.* at 5–6.

[18] *See* Rec. Doc. 60-1 at 5–7.

[19] *Id.* at 7–8.

[20] *Id.*

stipulated that Lexington is the proper defendant in this matter.[21]  On August 30, 2016, Lexington

filed the instant motion.[22]  On September 6, 2016, Ochsner filed its opposition.[23]  On September

27, 2016, Lexington filed a reply.[24]  On October 26, 2016, the Court held oral arguments on all of

the parties' motions for partial summary judgment.[25]

## II. Parties' Arguments

### A.   *Lexington's Arguments in Support of the Motion*

In its motion, Lexington contends that Ochsner cannot recover consequential damages and

derivative penalties under La. Rev. Stat. § 22:1973 for any construction delays allegedly caused

by Lexington.[26]  According to Lexington, La. Rev. Stat. § 22:1973 permits an insured to recover

damages directly attributable to an insurer's breach of the duty of good faith and fair dealing owed

to the insured.[27]  Lexington states that this duty includes the obligation "to adjust claims fairly and

promptly and make a reasonable effort to settle claims with the insured."[28]  Thus, Lexington argues

that, to recover damages under La. Rev. Stat. § 22:1973, Ochsner must not only show that

Lexington violated its good faith obligation, but also that Lexington's conduct caused Ochsner the

damages such that the damages were a "direct consequence" of the Lexington's breach.[29]

---

[21] Rec. Doc. 1 at 1–2.

[22] Rec. Doc. 60.

[23] Rec. Doc. 88.

[24] Rec. Docs. 129.

[25] Rec. Docs. 149, 150.

[26] Rec. Doc. 60-1 at 2, 4.

[27] *Id.* at 2, 11.

[28] *Id.* at 11 (citing La. Rev. Stat. § 22:1974(c)).

[29] *Id.* at 13 (citing La. Civ. Code art. 1997).

4

Though Lexington avers that Ochsner will not be able to prove any bad-faith conduct at trial,[30] Lexington argues that summary judgment is appropriate here because Ochsner cannot show that Lexington's alleged bad faith caused any delay in construction of the renovated building as Ochsner has alleged.[31] Lexington states that Ochsner has not produced any evidence that the renovations to the building were delayed by Lexington; rather, Lexington avers that "the *undisputed evidence* proves that Lexington's adjustment of the claim did not delay the construction at all."[32] Lexington contends that Ochsner "flatly admits that Lexington's conduct caused it no harm" and has "failed to produce *any evidence* of construction delays caused" by Lexington's alleged acts of bad faith.[33] For example, Lexington avers that Ochsner's corporate representative, Bobby Brannon, testified in a deposition that Lexington's assertion that the policy's $10 million sub-limit applied here did not damage Ochsner, and that the demolition work went forward as scheduled despite the dispute over its costs.[34] Likewise, according to Lexington, Ochsner Health System's Chief Operating Officer, Michael Hulefeld, stated in his deposition that "he was not aware of any delays in the construction project as a result of alleged delays in receiving payment from Lexington." [35] Additionally, Lexington avers that Ochsner's project architect, Jason Richards, testified in his deposition that he could not recall anyone in the construction team who

---

[30] *Id.* at 3, 5, 7–8.

[31] *Id.* at 3.

[32] *Id.* (emphasis in original).

[33] *Id.* at 14–15.

[34] *Id.*

[35] *Id.* at 15.

identified a delay attributable to Lexington's acts or omissions.[36]

Moreover, Lexington contends that Ochsner's own timeline for the building renovation demonstrates that the delay in the clinic opening after the collapse cannot be attributed to Lexington.[37] Citing the testimony of Ochsner's facility manager and corporate designee, Jay Britsch, Lexington argues that the 29 month period from the time of the accident to the date that Ochsner's clinic opened was the scheduled amount of time for renovation.[38] Lexington states that the parties agreed that restoring the damaged portion of the facility back to where it was on the day of the collapse would take 17 months, and then it was scheduled to take another 11 months for the original job to be completed.[39] Lexington alleges that Britsch stated that the "whole reason" there was the 17 month delay "was a result of the collapse and that's what that's referring to."[40] Thus, Lexington argues that Ochsner's own timeline shows there was no delay in construction, because "all 29 months were necessary to rebuild and open the facility."[41] According to Lexington, Britsch "did not (and could not) attribute any of the time" between the collapse and later opening of the new clinic to Lexington's conduct.[42] Lexington asserts that, absent any proof that Lexington's alleged bad faith conduct caused the delay, Ochsner is not entitled to any consequential damages or derivative penalties under La. Rev. Stat. § 22:1973 for any asserted

---

[36] *Id.*

[37] Rec. Doc. 60-1 at 3.

[38] *Id.* at 15–17.

[39] *Id.*

[40] *Id.* at 17.

[41] *Id.* at 18.

[42] *Id.* at 16.

delay. [43]   According to Lexington, because Ochsner cannot show Lexington caused any construction delays, Ochsner is, "at best," only entitled to the minimum statutory penalty of $5,000 if it can prove at trial that Lexington violated the statute by acting in bad faith.[44]

## B.   *Ochsner's Opposition to the Motion*

Ochsner opposes Lexington's motion.[45]   First, Ochsner argues that La. Rev. Stat. Ann. § 22:1973 allows it to recover any general or special damages suffered by the bad-faith conduct, and not just delays in reconstruction.[46]   Here, Ochsner contends that Lexington's failure to timely and fairly adjust Ochsner's claim caused Ochsner to incur substantial costs in human resources, consultant and attorneys' fees, hiring a new architect, organizing new bids, lost time value of money, and tied up its funds, among other damages.[47]   Ochsner asserts that those costs "arose directly from Lexington's bad faith."[48]   Though Lexington only challenges the causation element of § 22:1973, Ochsner states that Lexington engaged in numerous bad faith acts, including withholding important reports of its adjusters and consultants, misrepresenting material facts and policy provisions, and improperly disputing reasonable estimates of Ochsner's contractors.[49]

Second, Ochsner argues that Lexington's alleged bad-faith conduct did cause delays in the

---

[43] *Id.*

[44] *Id.* at 4.

[45] Rec. Doc. 88.

[46] *Id.* at 2.

[47] *Id.*

[48] *Id.* at 19.

[49] *Id.* at 5–6.

demolition and reconstruction process.[50] Ochsner contends that the original timeline for constructing the original configuration is irrelevant; what matters here, according to Ochsner, is if Lexington's conduct caused delays in the *actual* reconstruction of the building that occurred after the collapse changed Ochsner's plans.[51] Ochsner states it had to rebuild the structure in a new configuration to reduce the construction time necessary to restore the building in order to lessen the total delay in the clinic's opening.[52] The new plan the parties agreed to, Ochsner avers, was to shift the design to the north to an undamaged portion of the warehouse rather than rebuild it in the exact original location; Ochsner alleges that the new reconfiguration would have reduced the time needed to restore the building to its pre-collapse state by over 50%, *i.e.* from eleven months to only four months.[53] Ochsner argues that such gains were lost by Lexington's bad faith conduct contributing to roughly seven months of delay.[54]

For example, Ochsner asserts that "through September and much of October, Lexington expected Ochsner to wait while it investigated the north section, *and to decide collectively with Lexington whether to demolish the north section*."[55] Ochsner alleges that Lexington misrepresented material facts and policy provisions, withheld important documents, and improperly disputed estimates provided by Ochsner's contractors.[56] Ochsner states that Lexington

---

[50] *Id.*

[51] *Id.* at 3.

[52] *Id.*

[53] *Id.* at 3, 5.

[54] *Id.* at 3.

[55] *Id.* at 11.

[56] *Id.* at 6.

withheld the reports by its engineers and adjustors regarding the condition of the building, which delayed for months the demolition of the north section of the building by denying Ochsner the information it needed to safely and economically proceed with reconstruction.[57] Ochsner asserts that "after nearly two months of delay" it decided to proceed with the demolition without the necessary information.[58] Ochsner alleges that Lexington withheld the "vital" reports for a month and a half until after demolition had begun because Lexington was worried it would require Lexington to pay to repair the North section as well.[59] Ochsner also points to an email exchange where MKA engineer, William Bretnall, asked MKA's lead engineer for Lexington, Kevin McCoy, why a draft report on the cause of collapse had not been sent when Lexington's adjuster Joel Fisher had been "extremely anxious" to get it the week before. Ochsner alleges that McCoy responded that Fisher's "anxiousness has changed, as has our scope of work *and the political path of this claim*."[60] Ochsner argues that this report was then not sent until months later.[61]

Ochsner contends that Lexington's alleged bad faith acts caused Ochsner to incur other general and/or special damages apart from the delay in reconstruction as well.[62] For example, Ochsner avers that Britsch, Ochsner's corporate designee, testified that Lexington's bad faith acts "frequently required that [he] take time out of [his] normal work day to deal with Lexington's

---

[57] *Id.* at 11–12.

[58] *Id.* at 14.

[59] *Id.* at 13.

[60] *Id.* at 12.

[61] *Id.*

[62] *Id.* at 15–23.

representatives and materially prolonged the demolition and re-construction process."[63] Overall, Ochsner asserts that the issue of causation is an inherently factual question that cannot be determined at the summary judgment stage.[64] According to Ochsner, because it has produced evidence that Lexington's bad-faith conduct caused Ochsner to incur general and/or special damages, including but not limited to delays in reconstruction, the motion should be denied.[65]

## C.   *Lexington's Reply to Ochsner's Opposition*

Lexington contends that Ochsner's opposition timeline for the reconstruction is "irreconcilable with Ochsner's own 30(b)(6) testimony, is at odds with Ochsner's own business interruption claim, and is otherwise unsupported by record evidence."[66] Lexington again asserts that the scheduled timeline for reconstruction was 29 months, which is exactly how long it took for Ochsner to open its clinic; thus, Lexington avers that there is "simply no remaining time that could have been caused by Lexington."[67] Lexington argues that none of Ochsner's witnesses identified any Lexington-caused delays and that, Britsch, Ochsner's Rule 30(b)(6) witness, "repeatedly and unambiguously set out a reconstruction timeline that did not—and *could* not—include any delays attributable to Lexington."[68]

Moreover, Lexington states that Ochsner is attempting to "have it both ways" by simultaneously arguing that the same 17-month delay was caused by the roof collapse, and thus

---

[63] *Id.* at 20.

[64] *Id.* at 3.

[65] *Id.* at 8.

[66] Rec. Doc. 129 at 2.

[67] *Id.* at 3.

[68] *Id.* at 2–3.

covered by the insurance policy, and also partly caused by Lexington's bad-faith conduct, which Lexington is allegedly liable for "extra-contractually."[69] Lexington avers that Ochsner's Rule 30(b)(6) witness, Britsch, explored the timeline of the rebuilding, and never included in his explanations "any Lexington-caused delay."[70] Lexington argues that Britch's testimony as a Rule 30(b)(6) witness is "effectively Ochsner's last word on the matter" and cannot be rebutted with additional testimony by Ochsner or by Ochsner's "own interpretation of a hearsay document, Mr. Britsch's written timeline."[71]

According to Lexington, Ochsner only alleges, without supporting evidence, that Lexington is responsible for a seven month delay.[72] For example, in response to Ochsner's assertion that Lexington delayed the reconstruction by failing to share its studies with Ochsner, Lexington contends that Ochsner never even requested such studies until after it had authorized demolition.[73] Rather, the first two months of "delay" in reconstruction, Lexington avers, was the time required for the parties to both engage in a routine investigation into the accident.[74] Lexington further asserts that Ochsner is asking the Court "to accept an account under which Lexington at least *tripled* the construction timeline, but where no witnesses can seem to recall anything Lexington actually did to cause delay."[75] Lexington also argues that Ochsner alleges novel general

---

[69] *Id.* at 4 (emphasis omitted).

[70] *Id.* at 5.

[71] *Id.*

[72] *Id.* at 6.

[73] *Id.*

[74] *Id.* at 7.

[75] *Id.* at 11.

damages allegations that are unsupported by the record or the law.[76] For example, Lexington asserts that a corporation cannot suffer intangible harms such as emotional harm, and that Ochsner hired attorneys and consultants within weeks after filing a claim, and thus would be "hard pressed" to argue it was because of bad faith by Lexington.[77] Therefore, Lexington requests that the Court grant its motion for partial summary judgment precluding damages and derivative penalties under La. Rev. Stat. § 22:1973 or enter an Order declaring that Ochsner cannot recover delay-based damages.[78]

### III. Law and Analysis

A.    *Legal Standard for Summary Judgment*

Summary judgment is appropriate when the pleadings, the discovery, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[79] When assessing whether a dispute as to any material fact exists, the court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence."[80] All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment."[81]

---

[76] *Id.* at 7–8.

[77] *Id.*

[78] *Id.* at 11.

[79] Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

[80] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir. 2008).

[81] *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *Little*, 37 F.3d at 1075.

If the record, as a whole, "could not lead a rational trier of fact to find for the non-moving party," then no genuine issue of fact exists and the moving party is entitled to judgment as a matter of law.[82] The nonmoving party may not rest upon the pleadings, but must identify specific facts in the record and articulate the precise manner in which that evidence establishes a genuine issue for trial.[83]

The party seeking summary judgment always bears the initial responsibility of informing the Court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.[84] Thereafter, the nonmoving party should "identify specific evidence in the record, and articulate" precisely how that evidence supports his claims.[85] To withstand a motion for summary judgment, the nonmoving party must show that there is a genuine issue for trial by presenting evidence of specific facts.[86] The nonmovant's burden of demonstrating a genuine issue of material fact is not satisfied merely by creating "some metaphysical doubt as to the material facts," "by conclusory allegations," by "unsubstantiated assertions," or "by only a scintilla of evidence."[87] Rather, a factual dispute precludes a grant of summary judgment only if the evidence is sufficient to permit a reasonable trier of fact to find for the nonmoving party. Hearsay evidence and unsworn documents that cannot

---

[82] *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986).

[83] *See Celotex*, 477 U.S. at 325; *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

[84] *Celotex*, 477 U.S. at 323.

[85] *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994), *cert. denied*, 513 U.S. 871 (1994).

[86] *Bellard v. Gautreaux*, 675 F.3d 454, 460 (5th Cir. 2012) (citing *Anderson v. Liberty*, 477 U.S. 242, 248–49 (1996)).

[87] *Little*, 37 F.3d at 1075.

be presented in a form that would be admissible in evidence at trial do not qualify as competent opposing evidence.[88]

## B.      Analysis

Lexington argues that it is entitled to summary judgment on Ochsner's delay-related damages claim under La. Rev. Stat. § 22:1973 because Lexington's alleged bad faith conduct did not cause any delays in the reconstruction of Ochsner's building.[89]  Under La. Rev. Stat. § 22:1973, an insurance company is liable to an insured party for damages caused by breaches of the insurance company's duties as defined in the statute.[90]  Thus, to survive summary judgment on a claim under La. Rev. Stat. § 22:1973, Ochsner must show that: (1) Lexington breached the duties owed to Ochsner under the statute; and (2) Ochsner sustained damages as a result of the breach.[91]  First, the Court notes that while Ochsner's claim under La. Rev. Stat. § 22:1973 alleges that Lexington acted in bad faith repeatedly[92] and caused other damages beyond delays in the reconstruction process,[93]

---

[88] *Martin v. John W. Stone Oil Distrib., Inc*., 819 F.2d 547, 549 (5th Cir. 1987); Fed. R .Civ. P. 56(c)(2).

[89] Rec. Doc. 60-1 at 3.

[90] *See* La. Rev. Stat. § 22:1973(A) ("An insurer, including but not limited to a foreign line and surplus line insurer, owes to his insured a duty of good faith and fair dealing. The insurer has an affirmative duty to adjust claims fairly and promptly and to make a reasonable effort to settle claims with the insured or the claimant, or both. *Any insurer who breaches these duties shall be liable for any damages sustained as a result of the breach*." (emphasis added)). *See Powell v. Essentia Ins. Co.*, No. 13-369, 2013 WL 5839329, at *1 (M.D. La. Oct. 30, 2013) ("Under La. R.S. 22:1973 the Plaintiff may recover general and special damages if the insurer breached its duties defined in the statute.").

[91] La. Rev. Stat. § 22:1973(A). *See Brown v. Globe Life & Accident Ins. Co.*, No. 15-384, 2015 WL 6459698, at *4 (M.D. La. Sept. 29, 2015), *report and recommendation adopted*, No. 15-384, 2015 WL 6456567 (M.D. La. Oct. 26, 2015) ("[T]he court must calculate potential damages pursuant to La. R.S. § 22:1973 based upon the alleged 'damages sustained' as a result of Globe Life's alleged breach of the duty of good faith."); *Guidry v. State Farm Fire & Cas. Co.*, 2011-262 (La. App. 3 Cir. 10/5/11), 74 So. 3d 1276, 1290 (Amy, J., concurring) ("Louisiana Revised Statutes 22:1973 distinctly provides for damages sustained due to a breach of the duty of good faith and fair dealing, under Paragraph A, and for penalties due to that breach, under Paragraph C.").

[92] *See e.g.*, Rec. Doc. 84 at 2–3, 6 (arguing that Lexington failed to timely and fairly adjust Ochsner's claim, misrepresented material facts and policy provision, and withheld important documents, and further stating that identifying all of Lexington's bad faith acts "is beyond the scope of this motion.").

[93] *See id.* at 15 (stating that Lexington's bad faith caused general and/or special damages other than the delay in reconstruction).

14

Lexington does not argue, for the purposes of this limited motion, that it did not act in bad faith or that it did not cause other non-delay related damages.[94] Rather, Lexington's motion only seeks partial summary judgment on the issue of whether Ochsner has produced sufficient evidence to support its claim that Lexington's alleged bad faith conduct caused delays in the reconstruction of Ochsner's warehouse after the collapse of the roof.[95]

On a motion for summary judgment, the moving party bears the initial burden of identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.[96] Here, Lexington argues that Ochsner cannot establish a prima facie case that Lexington is liable under La. Rev. Stat. § 22:1973 for delay-related damages because Ochsner cannot show that Lexington's alleged bad faith conduct caused any delays in reconstruction.[97] Lexington argues that none of Ochsner's employees, including its Rule 30(b)(6) witness, identified any Lexington-caused delays in their depositions, and that the reconstruction took exactly 29 months as planned.[98] At oral argument, Lexington asserted that James Britsch was Ochsner's Rule (3)(b)(6) deposition witness with respect to the property damage component of the claim, and therefore was "the most knowledgeable person" on this issue and the only person designated to

---

[94] Rec. Doc. 60-1 at 3 ("The question of whether Lexington's conduct violated Louisiana's insurance claim adjuster statutes, however, is **not** at issue in this motion."); Rec. Doc. 12 at 8 ("And even if Ochsner could prove that any of these [other] damage categories were recoverable from Lexington, Lexington would still be entitled to partial summary judgment as to Ochsner's delay-based damages."). *See also* Rec. Doc. 150 at 8–9 (Lexington's counsel stating in oral argument that the allegations of other non-delay damages arising from Lexington's alleged bad faith conduct is "not an issue that Your Honor needs to concern yourself with now. . . We are seeking summary judgment based on their delay theory of damages, Your Honor. That's all Your Honor has to deal with. We'll deal with the other damages at trial.").

[95] *See* Rec. Doc. 60-1 at 2 ("Summary judgment is appropriate because Ochsner cannot establish that Lexington caused *any* delay in construction of its renovated building, which is the lynchpin for its claim for bad faith damages.").

[96] *Celotex,* 477 U.S. at 323.

[97] Rec. Doc. 60-1 at 3.

[98] *Id.* at 3, 14–17.

15

speak about it.[99] Lexington points out that during his deposition, Britsch never stated that any portion of the reconstruction delay was caused by Lexington's conduct, but merely described it as a result of the collapse.[100] Moreover, Lexington argues that another corporate representative for Ochsner, Bobby Brannon, testified that the demolition work went forward despite the insurance coverage disputes, and that Michael Hulefeld, the CEO of Ochsner Medical Center at the time of the accident, stated that he was not aware of any delays in construction resulting from payment delays from Lexington.[101] Thus, Lexington avers that, even assuming it acted in bad faith during the adjustment process, Ochsner has not adduced any evidence that those bad faith acts delayed reconstruction in any way.[102]

In response, Ochsner asserts that Lexington's bad faith conduct did cause delays in the reconstruction process.[103] Ochsner avers that in a sworn statement given by Britsch, he did state that Lexington's conduct, which Ochsner alleges constitutes bad faith, "materially prolonged the demolition and re-construction process." [104] Ochsner alleges that after the collapse, a new renovation plan was implemented to lessen the delay caused by the collapse, but that Lexington's bad faith actions caused an additional seven month delay under the post-collapse renovation timeline.[105] Ochsner asserts that Lexington's argument that construction was scheduled to take 29 months is only accurate under the construction timeline that existed before Ochsner reconfigured

---

[99] Rec. Doc. 150 at 12.

[100] Rec. Doc. 60-1 at 16; Rec. Doc. 60-2 at 86–89.

[101] *Id.* at 15.

[102] *Id.*

[103] Rec. Doc. 88 at 3.

[104] Rec. Doc. 88-39 at 34; Rec. Doc. 150 at 12.

[105] *Id.* at 3, 5–6.

its construction plan.[106] Ochsner also argues that Lexington withheld important reports and documents which Ochsner needed to timely make decisions during the demolition process, and was forced to proceed with the demolition without the documents "after nearly two months of delay."[107]

During oral argument, Ochsner further pointed to the deposition of Ochsner's representative Bobby Brannon, attached to Lexington's motion as an exhibit,[108] which it alleges supports its claim that Lexington's bad faith conduct caused delays in the building's reconstruction.[109] In that deposition, when asked about Ochsner's contention that Lexington delayed the demolition process by improperly disputing a construction bid, Brannon stated that Ochsner proceeded with the demolition "to the extent [it] could," but that the "frustration through this process certainly delayed getting [the demolition] done and the whole project accomplished."[110] Ochsner argues that although Britsch was Ochsner's Rule 30(b)(6) witness for these issues, Lexington also used other witnesses' deposition testimonies, such as Brannon and Hulefeld, as evidence in support of its motion.[111] Ochsner further pointed out that none of its witnesses were directly asked if the delay was a result of Lexington's conduct or directly stated that the delay was not a result of Lexington's conduct.[112]

Here, the Court finds that Ochsner has submitted sufficient evidence in support of its claim

---

[106] *Id.*

[107] *Id.* at 13–14.

[108] Rec. Doc. 60-5 at 63 (Lexington's Exhibit R).

[109] Rec. Doc. 150 at 9 (oral argument transcript).

[110] Rec. Doc. 60-5 at 74–77.

[111] Rec. Doc. 150 at 12.

[112] Rec. Doc. 105 at 11. The Court notes that Michael Hulfeld was asked in his deposition whether the project was delayed in any way "by any *delay in receiving payments* from Lexington," rather than caused by Lexington generally. Rec. Doc. 60-5 at 98.

that it is entitled to damages under La. Rev. Stat. § 22:1973 for the delays in the reconstruction process caused by Lexington's alleged bad faith to defeat summary judgment. Ochsner has pointed to statements by Britsch that Lexington's conduct "unnecessarily" and "materially" prolonged the reconstruction process,[113] while Lexington avers that Britsch testified generally in his deposition that the delay was a result of the collapse.[114] The Court notes that while Britsch was testifying as Ochsner's Rule 30(b)(6) witness for this issue, his testimony that the delay was a "result of the collapse" is not directly inconsistent with his sworn statement or the other evidence presented by Ochsner.[115] Moreover, Lexington has not asserted that Britsch ever directly stated that Lexington's alleged bad faith conduct did not cause any delays. Both parties also pointed to various testimony by Bannon[116] and Hulefeld[117] that they contend supports their respective positions regarding whether Lexington's conduct delayed the construction process.

Furthermore, both parties present conflicting evidence regarding the post-collapse construction timeline and whether Ochsner experienced any delays in reconstruction at all.[118]

---

[113] Rec. Doc. 88-39 at 34; Rec. Doc. 150 at 12.

[114] Rec. Doc. 60-1 at 16; Rec. Doc. 60-2 at 86–89.

[115] *See Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 893 (5th Cir. 1980) (holding that district courts must consider all the evidence before it and cannot disregard an affidavit merely because it conflicts to some degree with an earlier deposition); *Johnson v. Big Lots Stores, Inc.*, No. 04-3201, 2008 WL 6928161, at *3 (E.D. La. May 2, 2008) (Vance, J.) ("Although the testimony of a corporate representative under Rule 30(b)(6) is binding on the corporation, such testimony does not constitute a 'judicial admission' that decides an issue with finality or estops a party from contradicting the testimony of an earlier corporate representative."); *Hyde v. Stanley Tools*, 107 F. Supp. 2d 992, 993 (E.D. La. 2000) (Barbier, J.) (stating that while a court may disregard an affidavit "which directly contradicts" an earlier 30(b)(6) deposition . . . [c]ourts have allowed a contradictory or inconsistent affidavit to nonetheless be admitted if it is accompanied by a reasonable explanation."), *aff'd*, 31 F. App'x 151 (5th Cir. 2001).

[116] *See* Rec. Doc. 60-5 at 74–77 (Bannon stating that Lexington's conduct "certainly delayed" the process); Rec. Doc. 60-1 at 14 (Lexington citing testimony by Bannon that the demolition work went forward despite the parties' disputes over insurance coverage).

[117] Rec. Doc. 60-1 at 15 (Lexington citing testimony by Hulefeld that he was not aware of any delays resulting from Lexington's alleged payment delays); Rec. Doc. 150 at 11 (Ochsner's counsel stating that Hulefeld had testified that "other factors" besides the non-payment of Ochsner's claim "caused the delay.").

[118] *See, e.g.*, Rec. Doc. 60-1 at 3 (Lexington arguing that Ochsner's own timeline demonstrates there was no delay caused by Lexington); Rec. Doc. 88 at 2–3 (Ochsner arguing that Lexington's conduct caused seven months

Ochsner also points to evidence that Lexington caused "nearly two months of delay" by withholding reports and documents that Ochsner allegedly needed to properly begin the reconstruction process.[119] Accordingly, the Court finds that Ochsner has pointed to sufficient evidence supporting its claim that Lexington is liable for delay-related damages under La. Rev. Stat. § 22:1973 to defeat summary judgment. Lexington has not demonstrated that there are no material facts in dispute requiring a finding that Lexington did not cause delays in the reconstruction process as a matter of law. Therefore, the Court denies Lexington's instant motion for partial summary judgment.[120]

### IV. Conclusion

Based on the foregoing, the Court concludes that there are genuine issues of material fact precluding summary judgment regarding Ochsner's delay-related damages claim under La. Rev. Stat. § 22:1973. Accordingly,

**IT IS HEREBY ORDERED** that Lexington's "Motion for Partial Summary Judgment Precluding Damages and Derivative Penalties under LA. R.S. § 22:1973"[121] is **DENIED**.

**NEW ORLEANS, LOUISIANA**, this ___7th___ day of November, 2016.

_Nannette Jolivette Brown_
**NANNETTE JOLIVETTE BROWN**
**UNITED STATES DISTRICT JUDGE**

---

delay under the actual reconstruction timeline under a new configuration established after the collapse).

[119] *See* Rec. Doc. 88 at 10–14.

[120] Rec. Doc. 60.

[121] *Id.*