UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

OCHSNER CLINIC FOUNDATION                     CIVIL ACTION

VERSUS                                        NO. 15-2313

LEXINGTON INSURANCE COMPANY                   SECTION: "G"(2)

## ORDER

In this litigation, Plaintiff Ochsner Clinic Foundation ("Ochsner") alleges that Defendant Lexington Insurance Company ("Lexington") breached its insurance policy by failing to pay additional amounts owed to Ochsner, and that Lexington acted in bad faith during the adjustment process.[1] Pending before the Court are Lexington's "Motion for Partial Summary Judgment on Ochsner's Property-Related Claims"[2] and Ochsner's "Motion for Partial Summary Judgment on Insurance Coverage for Roof Insulation Code Upgrades."[3] Having reviewed the motions, the memoranda in support, the memoranda in opposition, the record, and the applicable law, the Court will grant Lexington's motion for partial summary judgment and deny Ochsner's motion for partial summary judgment.

## I. Background

### A.    Factual Background

In this case, Ochsner alleges that Lexington sold a Certificate of Property Facultative Reinsurance ("certificate") to Ochsner for the term of May 31, 2011, through May 31, 2012.[4] The

---

[1] *See* Rec. Doc. 1-1; Rec. Doc. 11 at 2–3.

[2] Rec. Doc. 65.

[3] Rec. Doc. 69.

[4] Rec. Doc. 1-1 at 2.

1

certificate made Lexington the reinsurer of Ochsner System Protection Company's ("OSPC") all-risks Commercial Property Policy ("insurance policy").[5] The insurance policy covered a former warehouse located at 1401 Jefferson Highway that Ochsner was repurposing to serve as an expanded internal medicine practice.[6] On June 10, 2012, construction on the building began and was scheduled to be completed by June 2012.[7] On August 24, 2011, a portion of the building's roof collapsed during the renovation, causing property damage and delaying the clinic's opening.[8]

Afterwards, Ochsner made a claim under the insurance policy for indemnification of the losses it alleges to have suffered as a result of the roof collapse.[9] According to Ochsner, on September 23, 2011, Lexington informed Ochsner that it was taking "full control of the investigation, defense, adjustment, and settlement of any claim."[10] Ochsner states that by doing so, OSPC did not have any role in handling Ochsner's insurance claim, and that Lexington became, "for all practical and legal purposes, the direct insurer of Ochsner."[11]

Ochsner argues that Lexington's subsequent tactics, disputes, and arguments regarding the insurance policy's coverage unnecessarily delayed work on the collapsed building, increased the cost of the repurposing project, and caused Ochsner to suffer further business interruption losses.[12]

---

[5] *Id.*; Rec. Doc. 68-2 at 3.

[6] Rec. Doc. 1-1 at 2; Rec. Doc. 68-2 at 4.

[7] Rec. Doc. 60-1 at 4.

[8] Rec. Doc. 1-1 at 2.

[9] *Id.*; Rec. Doc. 68-2 at 4; Rec. Doc. 60-1 at 5.

[10] Rec. Doc. 1-1 at 2.

[11] *Id.* at 3.

[12] Rec. Doc. 1-1 at 4.

Ochsner also alleges that Lexington has still not paid the full amount of Ochsner's property damage claim or business interruption losses claim.[13]   Accordingly, Ochsner argues that Lexington has breached its obligations under the insurance policy.[14]   Moreover, Ochsner asserts that Lexington's actions, such as allegedly prolonging the investigation, adjustment, and payment process, amount to bad-faith conduct in violation of La. Rev. Stat. §§ 22:1892 and 22:1973.[15]   Lexington, by contrast, asserts that it timely investigated, adjusted, and paid undisputed amounts of losses in Ochsner's claim as soon as Lexington learned of the claim.[16]   Lexington contends that it consistently worked with Ochsner to resolve any disputes over the scope of coverage while continuing to make payments throughout the adjustment process.[17]

### B.   Procedural Background

On June 26, 2014, Ochsner filed a Petition for Damages in the 24th Judicial District Court for the Parish of Jefferson, State of Louisiana.[18]   On June 25, 2015, Lexington removed the case to this Court after Ochsner voluntarily dismissed the only non-diverse defendant, OSPC, and stipulated that Lexington is the proper defendant in this matter.[19]   On August 30, 2016, Lexington and Ochsner filed the instant motions.[20]   On September 6, 2016, Lexington and Ochsner filed their

---

[13]  *Id.* at 4–5.

[14]  *Id.* at 5.

[15]  *Id.*

[16]  *See* Rec. Doc. 60-1 at 5–7.

[17]  *Id.* at 7–8.

[18]  *Id.*

[19]  Rec. Doc. 1 at 1–2.

[20]  Rec. Docs. 65, 69.

oppositions.[21] On September 27, 2016, Lexington and Ochsner filed their replies.[22] On October 26, 2016, the Court held oral arguments on all of the parties' motions for partial summary judgment.[23]

## II. Parties' Arguments

### A.   *Lexington's Motion for Partial Summary Judgment on Ochsner's Property-Related Claims*

#### 1.   Lexington's Arguments in Support of the Motion

In this motion, Lexington contends that it has already paid Ochsner more than $6.6 million for property damage related to the collapsed construction project and asserts that summary judgment is proper because Lexington has satisfied its obligation for Ochsner's property losses.[24] Specifically, Lexington argues it has no further obligation under the terms of the insurance policy for (1) Ochsner's construction "escalation costs," *i.e.* the increased costs for work that did not involve remediating damage caused by the collapse, and (2) the cost of roof insulation.[25]

Lexington states that the parties originally agreed that Lexington is only required to pay the costs to restore the building to its condition at the time of collapse, and not the cost of the planned renovations.[26] However, Lexington avers that Ochsner now seeks "escalation costs," claiming that the collapse and subsequent delays increased the costs of its planned renovations by

---

[21] Rec. Docs. 80, 82.

[22] Rec. Docs. 121,123.

[23] Rec. Docs. 149, 150.

[24] Rec. Doc. 65-1 at 2.

[25] *Id.*

[26] *Id.*

nearly $1.6 million.[27]  Lexington represents that Ochsner's theory is that the delays in construction following the collapse forced it to rebid some of the construction work that had not yet begun, resulting in more costly bids for materials and labor.[28]  Lexington argues that such costs are not covered by the insurance policy's "repair or replace" provision, as they are "mere inflationary cost increases" for work Ochsner planned on doing before the collapse.[29]

Lexington also asserts that Ochsner seeks $363,652 for the hypothetical costs of installing insulation in the roof of the collapsed portion of the building, citing a provision of the insurance policy that provides payment of the increased costs of repair when necessary to comply with local building codes.[30]  Lexington argues that at the time of the collapse, "most of the roof of the collapsed section was not insulated" and "was essentially a shelled out construction site."[31] Lexington avers that it has already paid the costs of rebuilding the concrete roof as it was prior to the collapse.[32]  Lexington states that the "increased cost of construction" provision only applies if the damaged property is actually rebuilt or replaced.[33]  However, Lexington argues that Ochsner never rebuilt or replaced the collapsed section of the roof.[34]  Moreover, Lexington contends that no building code requires roof insulation "to put the building back as it was—as an empty shell

---

[27] *Id.* at 3.

[28] *Id.* at 12.

[29] *Id.* at 3. During oral arguments, Ochsner stipulated to the fact that the insurance policy does not cover Ochsner's construction "escalation costs" claim. Rec. Doc. 150 at 85.

[30] Rec. Doc. 65-1 at 3.

[31] *Id.* at 3, 5.

[32] *Id.* at 18.

[33] *Id.* at 3.

[34] *Id.* at 18.

(*i.e.*, without windows or doors), open to the elements and under construction."[35]  According to

Lexington, Ochsner contends that the Louisiana energy code requiring insulation upgrade,

ASHRAE 90.1-2007 ("ASHRAE 90.1"),[36] requires installation of an insulated roof if the

collapsed section were to be rebuilt.[37]  However, Lexington argues that it does not apply "to

structures whose heating or cooling systems fall below certain capacity limits."[38]  Here, Lexington

states that the structure did not have heating or cooling equipment at all at the time of collapse.[39]

Lexington avers that its engineering consultant testified in a deposition that Louisiana building

codes are "silent with respect to the energy requirements of essentially a steel shell of a warehouse

that is not occupied, not conditioned, has no electrical or plumbing to speak of and has no

certificate of occupancy."[40]

## 2. Ochsner's Opposition to Lexington's Motion

Ochsner opposes Lexington's motion for partial summary judgment on Ochsner's property

damage-related claims.[41]  Ochsner argues that it has never contended the escalation costs were

covered by the all risks insurance policy; rather, Ochsner contends they are recoverable as damages

for Lexington's bad-faith breaches of its obligations, which "needlessly delayed the completion of

---

[35] *Id.* at 3.

[36] ASHRAE 90.1-2007 are building energy standards promulgated by the American Society of Heating, Refrigerating, and Air-Conditioning Engineers, Inc. ("ASHRAE"). *See* Rec. Doc. 65-6 at 2.

[37] Rec. Doc. 65-1 at 22.

[38] *Id.*

[39] *Id.*

[40] *Id.* at 23.

[41] Rec. Doc. 82.

the clinic."[42] According to Ochsner, under La. Rev. Stat. § 22:1973, Lexington is liable for any general or special damages sustained as a result of Lexington's alleged bad faith conduct.[43] Thus, Ochsner alleges that "at least a portion of those additional costs" are recoverable as damages for Lexington's bad faith conduct during its adjustment of Ochsner's property-damage loss.[44] Ochsner contends that the precise amount of escalation costs is an issue of fact for trial.[45]

Ochsner further asserts that Lexington's argument that ASHRAE 90.1 does not apply here "is based on a fundamental misconception—that, under the applicable codes, a building can lose its occupancy classification while it is being renovated."[46] Ochsner avers that the International Building Code ("IBC") applied in Jefferson Parish at the time of the collapse, and that, under the IBC, a building's occupancy classification only changes when a parish building official certifies that it complies with the new classification requirements.[47] According to Ochsner, a building retains its old classification, whether vacant or occupied, until that time.[48] Here, Ochsner asserts that the building had not been certified as an internal medicine clinic at the time of the collapse, and thus, under the IBC, was still classified as a warehouse.[49] Accordingly, Ochsner argues that it

---

[42] *Id.* at 1.

[43] *Id.* at 10.

[44] *Id.* at 9–10.

[45] *Id.*

[46] *Id.* at 2.

[47] *Id.* at 2–3.

[48] *Id.* at 3.

[49] *Id.*

is erroneous to describe the building as a "shell" to which the building codes do not apply.[50] Ochsner avers that the condition of the building, including whether it was heated or cooled at the time of the collapse, is immaterial to its classification; at the moment of collapse, Ochsner argues, it was classified as a warehouse.[51] Ochsner states that the governing building standards required that the building, if rebuilt, had to meet the requirements of a building classified as a warehouse, which includes the installation of an insulated roof.[52] Thus, Ochsner asserts that the all risks insurance policy entitles Ochsner to payment to rebuild that section to comply with the current codes applicable to warehouses, which includes the insulation requirements for the roof.[53]

## C.   *Lexington's Reply to Ochsner's Opposition*

Lexington alleges that "for nearly four years" Ochsner has characterized its "escalation costs" claim as part of its claim for property damages under the insurance policy, not as a bad faith damages claim.[54] Lexington avers that in order to "avoid any further vacillation" by Ochsner, the Court "should grant summary judgment on Lexington's Policy-based defense to escalation costs."[55]

Lexington also asserts that the IBC's occupancy classification is distinct from the ASHRAE 90.1's roof insulation requirements.[56] Lexington argues that applicability of the energy

---

[50] *Id.*

[51] *Id.* at 16.

[52] *Id.* at 19.

[53] *Id.* at 3.

[54] Rec. Doc. 123 at 2.

[55] *Id.* at 2.

[56] *Id.* at 6.

code governing roof insulation is based on a building's energy capacity, not its occupancy classification.[57] Lexington states that a hollowed-out building with no heating or cooling equipment does not trigger the roof insulation requirement that applies only to buildings with certain minimal levels of heating and cooling systems.[58] Thus, Lexington contends that roof insulation is not covered by the insurance policy that measures loss based on the conditions at the time of collapse.[59] Lexington argues that coverage is based on "actual" damaged property at the time of collapse, and not on "some *hypothetical* version of a building of a particular occupancy classification."[60] Lexington avers that the policy only covers work needed to comply with building codes "regulating the repair or reconstruction" of the actual "damaged property."[61] Lexington asserts that Ochsner misinterprets the deposition of Doug May, a Lexington employee, who testified that the policy covers code upgrades "for the *occupancy* of the building at the time of loss."[62] Lexington states that May, who is "not a code expert," used the term "occupancy" as a shorthand for the condition of the building at the time of the collapse, and regardless, such extrinsic evidence cannot vary the plain language of the code.[63]

Moreover, even if the building codes would have required an insulated roof, Lexington argues that Ochsner has never shown that the insurance policy's requirement that the damaged

---

[57] *Id.* at 2.

[58] *Id.* at 2–3, 6.

[59] *Id.* at 2–3.

[60] *Id.* at 6 (emphasis in original).

[61] *Id.*

[62] *Id.* at 7.

[63] *Id.*

property be actually rebuilt or replaced was satisfied.[64] Instead, Lexington asserts that Ochsner demolished the roof rather than replace it and turned the area into an open outdoor space.[65] Lexington states that Ochsner erroneously argues that because Lexington agreed to repair the replacement cost value of the damaged property even though Ochsner did not rebuild that property, it thus waived its right to enforce the code upgrade provision as well.[66] Lexington states that it expressly reserved all its rights under the policy repeatedly, including its rights under the Demolition Provision of the policy.[67] Moreover, Lexington avers that it did not make any representations regarding coverage for code upgrades.[68]

**B.   *Ochsner's Motion for Partial Summary Judgment on Insurance Coverage for Roof Insulation Code Upgrades***

**1.      Ochsner's Arguments in Support of the Motion**

Relatedly, Ochsner moves the Court for partial summary judgment on the issue of whether the insurance policy covers code upgrades for roof insulation in the damaged building.[69] Ochsner argues that the all risks policy covers increased costs for upgrades to damaged buildings needed to comply with current code requirements.[70] Ochsner alleges that Doug May, Lexington's Vice President of Property Claims, and Bill Lamond, Lexington's Property Claims Examiner, both

---

[64] *Id.* at 8.

[65] *Id.*

[66] *Id.* at 9–10.

[67] *Id.* at 10.

[68] *Id.* at 11.

[69] Rec. Doc. 69.

[70] *Id.* at 4, 6.

testified in their depositions that the policy covers these upgrades.[71] Ochsner also states that Lexington's corporate representative witness confirmed the policy provides coverage for code upgrades for a warehouse.[72] Accordingly, Ochsner argues that, based on the clear language of the all-risks policy and the deposition testimony of Lexington's employees, Lexington is liable under the policy for the cost of code upgrades for roof insulation to the warehouse.[73]

### 2. Lexington's Opposition to the Motion

Lexington opposes Ochsner's motion for partial summary judgment on insurance coverage for roof insulation code upgrades.[74] Lexington contends that the insurance policy's Demolition Provision covers code upgrades only if such upgrades are necessary "in order to comply with the minimum requirements of such law or ordinance regulating the repair or reconstruction of the damaged property on the same site."[75] Lexington asserts that the applicable code provision that would require roof insulation, ASHRAE 90.1, only applies if the building contains heating or cooling systems that meet certain minimal capacity limits.[76] Lexington avers that at the time of the collapse, the building had no heaters, HVAC, operating sprinkler system, or exterior windows or doors in place, and only had minimal electrical power necessary for construction.[77] Thus, Lexington argues that a building without heating and cooling systems does not trigger the insulated

---

[71] *Id.* at 4.

[72] *Id.* at 5.

[73] *Id.* at 8–9.

[74] Rec. Doc. 80.

[75] *Id.* at 9.

[76] *Id.* at 5.

[77] *Id.*

11

roof requirement of ASHRAE 90.1.[78] Lexington contends that Ochsner has only cited the testimony of Lexington employees that the policy, in some circumstances, provides coverage for code upgrades appropriate to a warehouse.[79] According to Lexington, they did not testify that the policy required these specific code upgrades for this specific collapsed building.[80] Rather, Lexington asserts that Ochsner has not shown that any building codes require these upgrades to restore "*this actual building* to what it was at the 'time and place of the loss' – *i.e.*, a *former* warehouse *with no heating or cooling* and no exterior windows or doors."[81]

Additionally, as asserted in its own motion for partial summary judgment, Lexington states that Ochsner has never rebuilt the collapsed section of the building, and instead developed a revised plan to use a non-collapsed section of the building.[82] Lexington argues that the insurance policy's Demolition Provision contains express language that Lexington "shall not be liable for any increased cost of construction loss unless the damaged property is actually rebuilt or replaced."[83] Thus, Lexington argues it is not liable for the costs of roof insulation that was never installed in a roof that was never replaced.[84]

---

[78] *Id.*

[79] *Id.* at 8.

[80] *Id.* at 9, 11.

[81] *Id.* (emphasis in the original).

[82] *Id.* at 8, 13.

[83] *Id.* at 13.

[84] *Id.*

### 3.   Ochsner's Reply to Lexington's Opposition

First, Ochsner contends that it did, in fact, rebuild or replace the damaged property.[85] Ochsner states that before it proceeded with its plan to rebuild, it asked Lexington to confirm that its coverage would not be impacted.[86] However, Ochsner avers that when Lexington promised that it would "provide replacement cost coverage to rebuild at the same site," it did not warn Ochsner that shifting its clinic to an undamaged portion of the warehouse would deprive it of code upgrade coverage.[87] Moreover, Ochsner alleges that Lexington paid for other code upgrades, and agreed to pay for repairs to the building to today's building standards.[88]

Second, Ochsner contends that the building code requires roof insulation for the damaged warehouse.[89] Ochsner argues that Lexington incorrectly focuses on the building's condition and not its occupancy classification under the code.[90] Ochsner avers that Jefferson Parish had adopted the IBC, which creates a system of classifying all buildings by occupancy.[91] Ochsner contends that the building was indisputably classified as a warehouse at the time of collapse, and the building's condition at the time of the collapse, including if it was heated or cooled, is immaterial.[92] Ochsner states that the building was classified as storage/warehouse when the renovation began,

---

[85] Rec. Doc. 121 at 2–3.

[86] *Id.* at 2.

[87] *Id.*

[88] *Id.* at 2–3.

[89] *Id.* at 4.

[90] *Id.* at 4–5.

[91] *Id.* at 5.

[92] *Id.*

and this had not changed by the collapse.[93] Ochsner argues that, despite "Lexington's litigation spin," Lexington's claims representatives testified in their depositions that occupancy, not condition, determines code upgrades here: "[Code-upgrade coverage] is for the occupancy of the building at the time of loss."[94]

### III. Law and Analysis

#### A.    *Legal Standard for Summary Judgment*

Summary judgment is appropriate when the pleadings, the discovery, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[95] When assessing whether a dispute as to any material fact exists, the court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence."[96] All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment."[97] If the record, as a whole, "could not lead a rational trier of fact to find for the non-moving party," then no genuine issue of fact exists and the moving party is entitled to judgment as a matter of law.[98] The nonmoving party may not rest upon the pleadings, but must identify specific facts in

---

[93] *Id.* at 7.

[94] *Id.* at 8 (alteration in the original).

[95] Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

[96] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir. 2008).

[97] *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *Little*, 37 F.3d at 1075.

[98] *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986).

the record and articulate the precise manner in which that evidence establishes a genuine issue for trial.[99]

The party seeking summary judgment bears the initial responsibility of informing the Court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.[100]  Thereafter, the nonmoving party should "identify specific evidence in the record, and articulate" precisely how that evidence supports his claims.[101] To withstand a motion for summary judgment, the nonmoving party must show that there is a genuine issue for trial by presenting evidence of specific facts.[102] The nonmovant's burden of demonstrating a genuine issue of material fact is not satisfied merely by creating "some metaphysical doubt as to the material facts," "by conclusory allegations," by "unsubstantiated assertions," or "by only a scintilla of evidence."[103] Rather, a factual dispute precludes a grant of summary judgment only if the evidence is sufficient to permit a reasonable trier of fact to find for the nonmoving party. Hearsay evidence and unsworn documents that cannot be presented in a form that would be admissible in evidence at trial do not qualify as competent opposing evidence.[104]

**B.    *Analysis***

Lexington argues that it is entitled to summary judgment on Ochsner's claim for its construction "escalation costs" under the insurance policy and Ochsner's claim for roof insulation

---

[99] *See Celotex*, 477 U.S. at 325; *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

[100] *Celotex*, 477 U.S. at 323.

[101] *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994), *cert. denied*, 513 U.S. 871 (1994).

[102] *Bellard v. Gautreaux*, 675 F.3d 454, 460 (5th Cir. 2012) (citing *Anderson v. Liberty*, 477 U.S. 242, 248–49 (1996)).

[103] *Little*, 37 F.3d at 1075.

[104] *Martin v. John W. Stone Oil Distrib., Inc*., 819 F.2d 547, 549 (5th Cir. 1987); Fed. R .Civ. P. 56(c)(2).

code upgrades to its building.[105]   In a separate motion, Ochsner seeks summary judgment on the issue of whether the insurance policy covers code upgrades for roof insulation in Ochsner's building at the time of the collapse.[106]   The Court first notes that Ochsner stipulated at oral argument that the insurance policy does not cover Ochsner's construction "escalation costs."[107] Rather, Ochsner asserts that Lexington is liable under La. Rev. Stat. § 22:1973 for these damages as a result of Lexington's alleged bad faith conduct in the adjustment process, which is not at issue in this motion.[108]   In light of Ochsner's stipulation and the fact that no evidence has been presented that the insurance policy covers Ochsner's construction "escalation costs," the Court finds that there are no genuine issues of material fact in dispute here. Accordingly, the Court will grant in part Lexington's motion for partial summary judgment, to the extent that Ochsner has not produced any evidence that the insurance policy covers Ochsner's construction "escalation costs."[109]

Next, both parties seek summary judgment on the issue of whether the insurance policy covers roof insulation code upgrades in Ochsner's warehouse at the time of the collapse.[110] Ochsner asserts that the all risks insurance policy requires Lexington to pay for the costs of building upgrades needed to comply with current code requirements, and that the applicable code

---

[105]  Rec. Doc. 65-1 at 2.

[106]  Rec. Doc. 69.

[107]  *See* Rec. Doc. 150 at 85. Lexington's counsel asserted that the policy did not cover the escalation costs and stated that "Ochsner has finally agreed with that." *Id.* When the Court asked Ochsner's counsel if Ochsner stipulated to that, Ochsner responded "[y]es, Your Honor. They're not covered under the policy, but the mere fact that they're not covered doesn't mean that they're not recoverable in this litigation as damages as a result of Lexington's bad-faith breach of the policy conditions." *Id.*

[108]  Rec. Doc. 82 at 1 ("Ochsner has never contended that those [escalation] costs are covered by the All Risks Policy. Part of those costs are nonetheless recoverable as damages for Lexington's bad-faith breaches of its obligations.").

[109]  Because Lexington's motion does not seek summary judgment on the issue of whether Lexington is liable under La. Rev. Stat. § 22:1973 for these "escalation costs," the Court will not address that question here.

[110]  Rec. Docs. 65, 69.

required roof insulation to be installed.[111] Lexington does not contest that the insurance policy includes such a provision that requires Lexington to pay for applicable code upgrades.[112] Rather, Lexington argues that, at the time of the collapse, no building ordinance required the installation of roof insulation in Ochsner's building, and that Ochsner never actually replaced the collapsed roof or paid these costs as required by the insurance policy.[113]

First, Lexington contends that Ochsner is not entitled to recover the costs for roof insulation in its building because no building code required it at the time of the collapse.[114] Lexington argues that the applicable building energy code regarding insulated roofs, ASHRAE 90.1, only applies to structures whose heating or cooling systems meet certain minimum capacity limits.[115] Lexington asserts that at the moment of collapse, the building clearly fell below the capacity limits, as the structure did not have any heating or cooling equipment and lacked the windows and doors needed to heat or cool the building.[116] Lexington asserts that it is not required to pay for code upgrades that would not have applied to the "empty, gutted former warehouse that was open to the elements" that existed at the time of collapse.[117]

In response, Ochsner agrees that "[w]hether Ochsner is entitled to coverage for roof insulation depends solely on whether ASHRAE applies to the hypothetical rebuilt warehouse that Lexington priced."[118] However, Ochsner asserts that at the time of the collapse, its building was

---

[111] Rec. Doc. 69-2 at 4.

[112] Rec. Doc. 65-1 at 3–4.

[113] *Id.*

[114] *Id.* at 21.

[115] *Id.* at 22.

[116] *Id.*

[117] *Id.*

[118] Rec. Doc. 82 at 16.

still classified under the International Building Code ("IBC") as a warehouse, and thus, according to Ochsner, ASHRAE 90.1's roof insulation requirements applies.[119]  Ochsner argues that the fact that the building was not heated or cooled at the time of collapse "is immaterial," because both the Jefferson Parish Code and the IBC required a building to meet the applicable code requirements of its occupancy classification.[120]  Ochsner alleges that no one disputes the building was classified as a storage/warehouse under IBC Section 311, and "the fact that the building collapsed during a stage of construction in which it was temporarily open to the air *does not change this*."[121]

First, the Court notes that both parties agree that that the insurance policy covers the increased costs of replacing or repairing its damaged property that are necessary to comply with the building codes "at the time of the loss."[122]  The parties also agree that the code provision requiring the installation of roof insulation in certain buildings is ASHRAE 90.1.[123]  The purpose of ASHRAE 90.1 is to "provide minimum requirements for the energy-efficient design" of certain buildings.[124]  Section 2.2(a) of ASHRAE 90.1 provides that the standard applies to "the envelope of buildings, provided that the enclosed spaces are (1) heated by a heating system whose output capacity is greater than or equal to 3.4 Btu/h·ft$^2$ or (2) cooled by a cooling system whose sensible output capacity is greater than or equal to 5 Btu/h·ft$^2$."

Here, Lexington presents evidence from the construction superintendent, Sparkman Long,

---

[119] *Id.* at 3.

[120] *Id.* at 16, 18.

[121] *Id.* at 19 (emphasis in original).

[122] *See* Rec. Doc. 65-1 at 21 (Lexington noting that the insurance policy covers increased costs associated with code upgrades where the direct physical loss or damage "causes the enforcement of any law, ordinance, governmental directive or standard in effect *at the time of loss* or damage." (emphasis added)); Rec. Doc. 82 at 11 (Ochsner stating that the all risks policy covers increased costs in repairing or reconstructing its damaged property "necessary to comply with building codes in force *at the time of the loss*." (emphasis added)).

[123] *See* Rec. Docs. 65-6, 65-7.

[124] Rec. Doc. 65-6 at 5.

that the collapsed section of Ochsner's building lacked heating and cooling equipment at the time of the collapse.[125] Lexington also points to photographs of the building prior to the collapse that Lexington represents shows that the doors and windows had been removed and demonstrates that the building was "exposed to the elements" and could not have been heated or cooled.[126] Moreover, Ochsner neither contests Lexington's assertion that the collapsed section of the building lacked heating and cooling equipment nor offers any evidence that its building had any heating or cooling capacity at that time.[127] Ochsner also does not argue that its building met the minimum heating or cooling thresholds that Lexington asserts would trigger the roof insulation requirements under ASHRAE 90.1.[128]

Rather, Ochsner contends that the building's classification as a storage building/warehouse under the IBC Section 311 triggers the energy code's roof insulation requirements.[129] However, Ochsner did not state, in any of the memoranda filed in support of its motion or in opposition to Lexington's motion or at oral argument, what provision or standard it relies on to argue that the

---

[125] *See* Rec. Doc. 65-3 at 28–29 (Sparkman Long testifying that he did not have knowledge of any heaters, air conditioning, doors, or windows in the collapsed section of the building, and that "[i]t was a warehouse, so I don't recall heat."); Rec. Doc. 150 at 89 (stating at oral arguments that Sparkman Long, the construction superintendent, provided "undisputed" testimony that at the time of the loss, "there was no heating and there was no cooling for the collapsed section. It was a construction site."); Rec. Doc. 65-5 at 32–35 (demonstrating that MKA employee Kevin McCoy stated in letter to James Britsch that "[a]t the time of the collapse, the unoccupied warehouse was neither heated nor cooled and there was no equipment in place to provide this conditioning in the collapsed and subsequently demolished areas.")

[126] *See* Rec. Doc. 65-2 at 199–117 (photographs of the building prior to the collapse); Rec. Doc. 150 at 89 (describing the photographs at oral argument).

[127] *See* Rec. Doc. 82 at 16 (Ochsner stating that Lexington's argument is that ASHRAE 90.1 energy code does not apply "because the building was open to the air (*i.e.*, not capable of being heated or cooled) at the time of the collapse," but that the "fact that it was not heated or cooled at that moment is immaterial."); Rec. Doc. 121 at 5 (Ochsner again contending that it "is immaterial whether the building was 'heated or cooled,' 'abandoned,' 'unfinished,' 'unconditioned,' 'shelled-out,' 'open to the elements,' [or] a 'former warehouse.'")

[128] Rec. Doc. 82 at 16–19. *See* Rec. Doc. 150 at 93 (Ochsner stating at oral argument that "the question is was the roof insulation that Ochsner seeks payment for mandated by the applicable building codes at the time of the collapse? The answer is yes. ASHRAE does apply.").

[129] *Id.*

building's classification as storage/warehouse triggers ASHRAE 90.1's requirements for an insulated roof. As stated above, the clear language of ASHRAE 90.1 defines its coverage in terms of a building's energy capacity limits, and not in terms of a building's classification under the separate IBC standards. Moreover, Ochsner has not provided any support for its argument that a building classified as storage/warehouse under the IBC independently requires roof insulation even if it lacked any heating or cooling capacity. Accordingly, the Court finds that Ochsner has not presented any evidence or code provision to support its argument that the building's IBC classification triggers the roof insulation requirement of ASHRAE 90.1.

Ochsner does point to deposition testimony from various witnesses that Ochsner argues supports its position that ASHRAE 90.1 applies in this instance.[130] Ochsner represents that two of Lexington's senior personnel, Doug May and Bill Lamond, testified that the all-risks policy covered code upgrades for roof insulation for a warehouse.[131] However, Ochsner failed to point to any statement or admission by May and Lamond in their depositions where they made such a concession. Rather, the deposition testimony offered by Ochsner shows only that Lexington's representatives stated that the insurance policy would cover code upgrades to warehouses generally, which Lexington does not contest, but that neither witness conceded that ASHRAE 90.1's roof insulation requirements applied here.[132] Moreover, other witnesses cited by Ochsner in support of its theory testified in direct contradiction to Ochsner's argument. For example, Lexington's expert, Lee Connell, testified in his deposition that ASHRAE 90.1 only applied if, at

---

[130] Rec. Doc. 69-2 at 4–5.

[131] *Id.* at 4–5, 7–8.

[132] *See, e.g.*, Rec. Doc. 82 at 16 & n.50 (citing the deposition of Lexington executive Doug May, who testified that "the policy covers the code that is necessary for that occupancy" at the time of the loss and that code coverage for a warehouse would be triggered); *id.* at 19 & n.60 (stating that Lexington's expert, Lee Connell, confirmed that the insurance policy entitles Ochsner to code upgrades for a warehouse generally); *see also* Rec. Doc. 69-2 at 7 & n. 19–21 (asserting that Bill Lamond, Lexington's Property Claims Examiner, agreed that Lexington must pay for whatever code upgrades are required for a roof of a warehouse).

the time of the collapse, "what collapsed had been heated and cooled and they were to rebuild it, then I believe you would rebuild it according to the current code."[133]  Moreover, Ochsner has not pointed to any evidence that these witnesses are code experts, or that their testimony supports a different interpretation of the plain language of ASHRAE 90.1. Accordingly, the Court finds that the deposition testimony pointed to by Ochsner does not provide support for its argument that the ASHRAE 90.1 requirements applied to its building. Therefore, under this theory, there are no material facts in dispute.

For the first time at oral argument, Ochsner asserted a new theory that because, according to Ochsner, the building had a sprinkler system at the time of collapse, "the codes" require that the building must be heated to at least 40 degrees Fahrenheit, which, Ochsner asserts, for a building the size of Ochsner's warehouse, would exceed the minimum threshold requirements under ASHRAE 90.1 that would trigger its insulated roof requirements.[134]  Ochsner also averred at oral argument that because the building was classified as a storage facility, "there are certain requirements that go along with that, including sprinklers, including heating, and heating triggers the ASHRAE code."[135]  However, when the Court asked Ochsner to identify what code provision requires a sprinkler system in Ochsner's building, Ochsner was unable to do so.[136]  Ochsner also failed to point to the code provision that it suggests would require a building with a sprinkler system to be heated, and Ochsner provided no evidence at all that the heating requirement for a sprinkler system would be sufficient to meet the minimum heating requirements that trigger AHSRAE 90.1's roof insulation requirement.

---

[133] *See* Rec. Doc. 82-2 at 10.

[134] Rec. Doc. 150 at 93.

[135] *Id.* at 96.

[136] Rec. Doc. 150 at 97 (Ochsner stating that "[t]here would be a code provision on that. And, Your Honor, I can't point to it right now . . . .").

While there is some dispute as to whether or not the building had a sprinkler system at the time of the collapse,[137] a factual dispute may only defeat summary judgment when it is "material."[138] As the Supreme Court held in *Anderson v. Liberty Lobby, Inc.*, "this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."[139]

Here, whether or not a sprinkler system existed in Ochsner's building is immaterial, because Ochsner has not provided any evidence, law, or case citations to support its argument that, through some unidentified chain of code provisions, ASHRAE 90.1's roof insulation requirement would be triggered if Ochsner could establish that a sufficient sprinkler system existed at the time of the collapse. While Ochsner stated at oral argument that sprinklers and heating were required because the building was classified as a storage facility, the Court again notes that Ochsner has not pointed to any IBC provisions or other code provisions that require either. Ochsner also generally averred at oral argument that sprinkler systems must be heated "under the National Fire Prevention - - the NFPA."[140] However, Ochsner failed to point to which of the hundreds of standards and provisions promulgated by the NFPA regulating many different types of sprinkler systems would

---

[137] For example, during oral argument Ochsner pointed to the deposition testimony of Sparkman Long, which Ochsner averred supports its argument that it is "undisputed" that the building still had "sprinkler piping, main lines, sprinkler pipes, and sprinkler heads." *Id.* However, in that deposition, Long actually stated that there were "possibly" some main sprinkler lines left in the collapsed area at the time of the collapse, but that he believed all the lines inside the building were "capped and cut through" and that the "branch piping" and accompanying "sprinkler heads" would have been removed by that point. Rec. Doc. 65-3 at 30. Ochsner also points to pictures from the day of the collapse that show water "shooting up from broken sprinkler pipes," but that does not address whether a full sprinkler system existed at the time of the collapse. Rec. Doc. 150 at 98.

[138] Fed. R. Civ. P 56 (a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any *material fact* and the movant is entitled to judgment as a matter of law." (Emphasis added)).

[139] 477 U.S. 242, 247–48 (1986) (emphasis in original).

[140] Rec. Doc. 150 at 99.

apply here.[141]  Moreover, Ochsner has not pointed to any evidence or testimony that the unknown code would apply to the warehouse sprinkler system in the condition that existed at the time of the collapse.[142]  Finally, Ochsner failed to provide any support for its argument that the level of heating that Ochsner alleges is required for its sprinkler system alone would be sufficient to meet the minimum heating requirement that triggers ASHRAE 90.1.[143]  As the Fifth Circuit has repeatedly stated, "unsubstantiated assertions are not competent summary judgment evidence," and a district court does not have a duty under Rule 56 "to sift through the record in search of evidence to support a party's opposition to summary judgment."[144]  Thus, even taking the evidence in the light most favorable to Ochsner and assuming there was a fully functioning sprinkler system at the time of the collapse, Ochsner has not produced evidence that it would then be entitled to the costs of roof insulation under ASHRAE 90.1.

Under Federal Rule of Civil Procedure 56, the party moving for summary judgment bears the initial burden of demonstrating that there are no genuine issues of material fact and that it is entitled to a judgment as a matter of law.[145]  Here, the Court finds that Lexington has presented sufficient evidence that the collapsed section of Ochsner's building did not meet the minimum

---

[141]  *See* "List of NFPA codes and Standards," National Fire Protection Association, http://www.nfpa.org/codes-and-standards/all-codes-and-standards/list-of-codes-and-standards (listing NFPA Code No. 1 through NFPA Code No. 8506).

[142]  *See* Rec. Doc. 150 at 97 (Ochsner pointing to Long's deposition for support that there was a sprinkler system in its building); Rec. Doc. 65-3 at 30 (Long testifying in his deposition that parts of the alleged sprinkler system were cut or removed).

[143]  In the deposition of Lee Connell attached to Ochsner's opposition memorandum to Lexington's motion, he suggests that Ochsner could "[f]ind a more direct way of heating the sprinkler system if that is what you want to do without heating the entire structure just for the sprinkler system. Good grief." Rec. Doc. 82-2 at 7.

[144]  *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 & n. 7 (5th Cir. 1992)).

[145]  *See Hunt v. Cromartie*, 526 U.S. 541, 549 (1999); *Provident Life & Accident Ins. Co. v. Goel*, 274 F.3d 984, 991 (5th Cir.2001); *Tavernini v. Bank of Am., N.A.*, No. 4:12CV420, 2014 WL 1290063, at *3 (E.D. Tex. Mar. 31, 2014).

heating and cooling levels necessary to trigger ASHRAE 90.1's roof insulation requirements. Once the moving party satisfies its summary judgment burden by showing there are no genuine issues of material fact for trial, the nonmoving party must "set forth and support by summary judgment evidence specific facts showing the existence of a genuine issue for trial."[146] Ochsner must look beyond its pleadings and "designate specific facts in the record to show that there is a genuine issue for trial."[147]

Here, the Court finds that Ochsner has failed to present competent evidence supporting its assertion that the roof insulation requirements under ASHRAE 90.1 applied to its warehouse. Ochsner has presented no evidence that the building contained heating and cooling equipment that would meet the minimum requirements of ASHRAE 90.1, or that being classified as a storage facility under the IBC requires the building to be heated to that level. Moreover, though Ochsner argued for the first time at oral arguments that a sprinkler system can trigger heating requirements in another unidentified code which would be sufficient to then trigger ASHRAE 90.1, Ochsner failed to point to the law or facts in the record that would support such a theory. Accordingly, the Court finds that there are no genuine issues of material fact here, and that Ochsner has not pointed to evidence that substantiates its assertion that Lexington is liable for the cost of installing roof insulation under the insurance policy "such that a reasonable jury could return a verdict for the nonmoving party."[148]

## IV. Conclusion

Considering Lexington's motion for partial summary judgment, and based on the foregoing, the Court concludes that, drawing all reasonable inferences in favor of Ochsner, there

---

[146] *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255–57 (1986)).

[147] *Stults v. Conoco, Inc.*, 76 F.3d 651, 655 (5th Cir. 1996)).

[148] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

are no genuine issues of material fact here. Thus, Lexington is entitled to summary judgment on its claim that it is not liable under the insurance policy for Ochsner's increased "construction costs" or the cost of installing roof insulation in Ochsner's warehouse. Likewise, Ochsner has failed to point to sufficient evidence or facts in the record that support its assertion that an applicable code provision required roof insulation to be installed in Ochsner's warehouse at the time of the collapse.[149] Accordingly,

**IT IS HEREBY ORDERED** that Lexington's "Motion for Partial Summary Judgment on Ochsner's Property-Related Claims"[150] is **GRANTED** to the extent that Lexington is not liable for Ochsner's construction "escalation costs" under the parties' insurance policy and to the extent that Lexington is not liable for the cost of installing roof insulation. Ochsner has not provided the Court with any evidence beyond unsubstantiated assertions that an applicable code provision required the installation of roof insulation in Ochsner's warehouse at the time of the collapse. The Court does not address whether Lexington is liable for Ochsner's construction "escalation costs" under La. Rev. Stat. § 22:1973 as Ochsner appears to aver.

---

[149] Because the Court finds that there is no genuine issue of material fact regarding whether a code provision required roof insulation at the time of the collapse, the Court will not address Lexington's second argument that the insurance policy does not cover roof insulation because the roof was never repaired or replaced.

[150] Rec. Doc. 65.

**IT IS FURTHER ORDERED** that Ochsner's "Motion for Partial Summary Judgment on Insurance Coverage for Roof Insulation Code Upgrades"[151] is **DENIED** because it has not pointed to evidence that demonstrates that, as a matter of law, Lexington is liable for the cost of installing roof insulation under the insurance policy.

**NEW ORLEANS, LOUISIANA**, this __7th__ day of November, 2016.

**NANNETTE JOLIVETTE BROWN**
**UNITED STATES DISTRICT JUDGE**

---

[151] Rec. Doc. 69.

26