## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**OCHSNER CLINIC FOUNDATION**                    **CIVIL ACTION**

**VERSUS**                                       **NO. 15-2313**

**LEXINGTON INSURANCE COMPANY**                  **SECTION: "G"(2)**

## ORDER

In this litigation, Plaintiff Ochsner Clinic Foundation ("Ochsner") alleges that Defendant Lexington Insurance Company ("Lexington") breached its insurance policy by failing to pay additional amounts owed to Ochsner, and that Lexington acted in bad faith during the adjustment process.[1] Pending before the Court is Lexington's "Motion for Summary Judgment on All or Certain Portions of Plaintiff's Claim for Business Interruption Damages."[2] Having reviewed the motion, the memoranda in support, the memorandum in opposition, the record, and the applicable law, the Court will deny the motion.

## I. Background

### A.    *Factual Background*

In this case, Ochsner alleges that Lexington sold a Certificate of Property Facultative Reinsurance ("certificate") to Ochsner for the term of May 31, 2011, through May 31, 2012.[3] The certificate made Lexington the reinsurer of Ochsner System Protection Company's ("OSPC") all-risks Commercial Property Policy ("insurance policy").[4] The insurance policy covered a former

---

[1] *See* Rec. Doc. 1-1; Rec. Doc. 11 at 2–3.

[2] Rec. Doc. 63.

[3] Rec. Doc. 1-1 at 2.

[4] *Id.*; Rec. Doc. 68-2 at 3.

1

warehouse located at 1401 Jefferson Highway that Ochsner was repurposing to serve as an expanded internal medicine practice.[5] On June 10, 2011, construction on the building began and was scheduled to be completed by June 2012.[6] On August 24, 2011, a portion of the building's roof collapsed during the renovation, causing property damage and delaying the clinic's opening.[7]

Afterwards, Ochsner made a claim under the insurance policy for indemnification of the losses it alleges to have suffered as a result of the roof collapse.[8] According to Ochsner, on September 23, 2011, Lexington informed Ochsner that it was taking "full control of the investigation, defense, adjustment, and settlement of any claim."[9] Ochsner states that by doing so, OSPC did not have any role in handling Ochsner's insurance claim, and that Lexington became, "for all practical and legal purposes, the direct insurer of Ochsner."[10]

Ochsner argues that Lexington's subsequent tactics, disputes, and arguments regarding the insurance policy coverage unnecessarily delayed work on the collapsed building, increased the cost of the repurposing project, and caused Ochsner to suffer further business interruption losses.[11] In particular, Ochsner seeks more than $29.5 million in business interruption losses it allegedly suffered as a result of the 17-month delay caused by the collapse, and contends that Lexington has

---

[5] Rec. Doc. 1-1 at 2; Rec. Doc. 68-2 at 4.

[6] Rec. Doc. 60-1 at 4.

[7] Rec. Doc. 1-1 at 2.

[8] *Id.*; Rec. Doc. 68-2 at 4; Rec. Doc. 60-1 at 5.

[9] Rec. Doc. 1-1 at 2.

[10] *Id.* at 3.

[11] Rec. Doc. 1-1 at 4.

only paid approximately $1 million on Ochsner's business interruption claim.[12] Ochsner alleges that Lexington has still not paid the full amount of Ochsner's property damage claim or business interruption losses claim.[13] Accordingly, Ochsner argues that Lexington has breached its obligations under the insurance policy.[14] Moreover, Ochsner asserts that Lexington's actions, such as allegedly prolonging the investigation, adjustment, and payment process, amount to bad-faith conduct in violation of La. Rev. Stat. § 22:1892 and La. Rev. Stat. § 22:1973.[15] Lexington, by contrast, asserts that it timely investigated, adjusted, and paid undisputed amounts of losses in Ochsner's claim as soon as Lexington learned of the claim.[16] Lexington contends that it consistently worked with Ochsner to resolve any disputes over the scope of coverage while continuing to make payments throughout the adjustment process.[17]

### B.     Procedural Background

On June 26, 2014, Ochsner filed a Petition for Damages in the 24th Judicial District Court for the Parish of Jefferson, State of Louisiana.[18] On June 25, 2015, Lexington removed the case to this Court after Ochsner voluntarily dismissed the only non-diverse defendant, OSPC, and the parties stipulated that Lexington is the proper defendant in this matter.[19] On August 30, 2016,

---

[12] Rec. Doc. 63-1 at 22.

[13] Rec. Doc. 1 at 4–5.

[14] *Id.* at 5.

[15] *Id.*

[16] *See* Rec. Doc. 60-1 at 5–7.

[17] *Id.* at 7–8.

[18] *Id.*

[19] Rec. Doc. 1 at 1–2.

Lexington filed the instant motion.[20] On September 6, 2016, Ochsner filed its opposition.[21] On September 27, 2016, Lexington filed a reply.[22] On October 26, 2016, the Court held oral arguments on all of the parties' motions for partial summary judgment.[23]

## II. Parties' Arguments

### A.   *Lexington's Arguments in Support of the Motion*

In this motion, Lexington contends that Ochsner seeks more than $29.5 million in business interruption losses it alleged suffered as a result of delays caused by the collapse of the building by using "incurably flawed" methodology.[24] Lexington asserts that it has already paid approximately $1 million on Ochsner's business interruption claim, and seeks summary judgment on the remaining amount.[25] Lexington states that the insurance policy covers business interruption losses, defined as "the actual loss sustained" by Ochsner during the "period of interruption" between the original anticipated date of substantial completion had no loss occurred and the actual date of completion.[26] However, Lexington argues that Ochsner's business interruption loss claim seeks to recover far more than what Ochsner is entitled to under the insurance policy.[27]

---

[20] Rec. Doc. 63.

[21] Rec. Doc. 83.

[22] Rec. Docs. 130.

[23] Rec. Docs. 149, 150.

[24] Rec. Doc. 63-1 at 2.

[25] *Id.*

[26] *Id.* at 4.

[27] *Id.* at 2–3.

### 1.     Ochsner's "Downstream Revenue" Theory

First, Lexington asserts that 95% of Ochsner's business interruption losses were calculated using an allegedly flawed "downstream revenue" theory.[28]  According to Lexington, Ochsner avers that primary care physicians act as business generators for the entire Ochsner system by seeing patients for routine exams or minor medical issues and referring them to specialists elsewhere in the Ochsner system on referral (*e.g.*, oncologists, cardiologists, etc.).[29]  Lexington states that it is Ochsner's position that this specialist-generated "downstream revenue" should be attributed to the primary care physicians at the new clinic. [30]  However, Lexington argues that Ochsner's downstream theory is too speculative, and that the policy itself allows for only actual losses and excludes "[i]ndirect, remote, or consequential loss or damage."[31]  Therefore, Lexington states that summary judgment is appropriate on 95% of Ochsner's business interruption claim.[32]

Lexington argues that Ochsner has no evidence that its patients would not have visited an Ochsner specialist but for an earlier visit to an Ochsner primary care physician.[33]  Lexington avers that Ochsner's methodology rests on the presumption that every time a patient sees an Ochsner specialist after visiting a primary care physician, that specialist-revenue should be attributed to the

---

[28] *Id.* at 8 (quoting *Hall v. Arkansas-Louisiana Gas Co.*, 368 So. 2d 984, 991 (La. 1979) ("Actual damages arising from a breach of contract must be proven; they cannot be merely speculative or conjectural."); *Nick Farone Music Ministry v. City of Bastrop*, 179 So. 3d 629, 631 (La. App. 2015) ("Loss of business income or profits is a type of special damages that must be proved with reasonable certainty . . . It must be shown that the loss of income was, more probably than not, tributable to the defendants conduct or fault.").

[29] *Id.*

[30] *Id.* at 8–9.

[31] *Id.* at 13.

[32] *Id.* at 12.

[33] *Id.* at 2.

primary care physician.[34]  Lexington contends that this conflates correlation with causation, and is too speculative and flawed to submit to a jury.[35]  Without more evidence establishing the causation link, Lexington argues that Ochsner cannot claim the revenues for "downstream" specialist visits.[36] For example, Lexington states that a patient may be referred to a specialist by a friend or family member, another specialist, or through an insurer's preferred provider director.[37]  There is no evidence, Lexington avers, that Ochsner's specialists are "entirely dependent on Ochsner [primary care physicians] for the patients they see, if a [primary care physician] sees the patient first."[38] According to Lexington, it is "[m]ere common sense" that Ochsner's specialists would still see many patients if the expanded clinic was never built, and Lexington points out that Michael Hulefeld of Ochsner admitted that patients pick specialists "through many gateways."[39]  Moreover, Lexington contends that Ochsner's methodology allows it to count revenues from specialist visits up to three years after the visit to the primary care physician, and to attribute visits to heart specialists out of a standard flu shot; but, Lexington argues, to say that a June 2015 specialist visit was "caused by" a September 2012 primary care physician visit or that unrelated prior primary care visits created specialist revenue is "completely speculative."[40]  Thus, Lexington alleges that Ochsner has not demonstrated that there was any "actual loss sustained" as required by the

---

[34] *Id.* at 9.

[35] *Id.*

[36] *Id.*

[37] *Id.* at 15.

[38] *Id.*

[39] *Id.*

[40] *Id.*

insurance policy.[41]

### 2.     Ochsner's "Period of Interruption" Time Frame Comparison

Second, Lexington asserts that Ochsner came up with its business interruption claim by comparing the period of interruption time frame of when the clinic would have been opened if not for the roof collapse (Timeframe 1: September 2012–February 2014) to the first 17 months after the new clinic opened (Timeframe 2: February 2014–June 2015).[42] However, Lexington states that Ochsner has not shown how these two periods and their market conditions are comparable, and does not account for other explanations for why net revenue might have increased after the clinic opened.[43] For example, Lexington avers that other external factors in Timeframe 2, such as the implementation of the Affordable Care Act in 2014, changes in the reimbursement rates, differences in healthcare services demands, and growth in patient care, make a comparison of two 17 month periods at a hospital system "speculative at best."[44] Moreover, Lexington contends that Ochsner is excluding the "large volume of patients" who saw a primary care physician *before* the collapse and was seen by a specialist during Timeframe 1.[45] In particular, Lexington states that Ochsner's Timeframe 2 counts all specialist visits if a primary care physician had seen the patient first at any point in Timeframe 1 or 2, a 34 month period; however, Lexington points out that for Timeframe 1, Ochsner only counts specialist visits if a primary care physician had seen the patient only in Timeframe 1, only a 17 month period rather than a 34 month period like Ochsner used for

---

[41] *Id.* at 13.

[42] *Id.* at 2.

[43] *Id.* at 2–3, 10.

[44] *Id.* at 10, 19.

[45] *Id.* at 9–10.

Timeframe 2.[46] The result, Lexington avers, is that Ochsner artificially deflates its Timeframe 1 revenue by failing to count "hundreds, if not thousands, more specialist visits" in Timeframe 1, which Lexington contends creates the appearance of greater losses than Ochsner actually suffered.[47] Thus, Lexington argues that Ochsner's business interruption claim is too speculative to survive summary judgment.[48]

### 3. Ochsner's Claim for "Ramp Up" Costs

Third, Lexington argues that Ochsner is not entitled to the $7.5 million it claims are revenue losses during the post-opening "ramp up" period.[49] According to Lexington, the insurance policy only permits recovery of post-opening losses up to three months when necessary to "restore" Ochsner's business to "the condition that would have existed had no loss occurred."[50] Here, Lexington contends that Ochsner was *expanding* its business that did not exist as of September 2012, and thus was not covered by the insurance policy.[51] Lexington contends that if the clinic had opened as scheduled in September 2012, the clinic's business would have started at zero regardless and expanded naturally over the following three months.[52] According to Lexington, this did not change when the new clinic opened in September 2014, and, thus, there was nothing to "restore" that would be covered by the policy's three month extended period of indemnity after

---

[46] *Id.* at 16–17.

[47] *Id.* at 17.

[48] *Id.* at 20.

[49] *Id.* at 3.

[50] *Id.*

[51] *Id.*

[52] *Id.* at 10.

losses.[53]

### 4.     Ochsner's Decision to Hire Doctors from Residency Programs

Fourth, Lexington avers that Ochsner cannot claim approximately $3.8 million as an adjustment to its actual post-opening experience because the new primary care doctors Ochsner hired after the delayed opening could not begin working until several months later when their residency programs ended.[54] Lexington states this claim is "inconsistent" with the plain language of the insurance policy, which requires "due consideration" of Ochsner's "actual experience," and that the further delay was caused by Ochsner's own business decision to hire doctors from residency programs rather than ones who could start immediately in February 2014.[55] According to Lexington, hiring new doctors out of residency programs was a business choice not caused by the partial collapse, and, absent direct causation, is precluded from recoverable lost net revenues.[56] Lexington alleges that Ochsner has offered no evidence that it could not hire non-resident primary care physicians to start in February 2014.[57]

### 5.     Ochsner's Plan to Hire Additional Primary Care Physicians

Fifth, Lexington argues that Ochsner is not entitled to recover any amount of business losses for the first year (September 2012–September 2013), because, after the collapse, Ochsner

---

[53] *Id.* at 10–11 (citing *Safeguard Storage Props., LLC v. Donahue Favret Contractors, Inc.*, 60 So. 3d 110, 122 (La. App. 2011) ("[t]he extended period begins when the damaged properties are actually repaired … and ends when the business *returns to pre-loss conditions*" (emphasis added)); *cf. Home Indem. Co. v. Hyplains Beef, L.C.*, 893 F. Supp. 987, 993 (D. Kan. 1995) (requirement that insured "resume" operations suggests that "there must have necessarily been a stoppage of operations from which it was necessary to begin anew")_.

[54] *Id.* at 3, 23–24.

[55] *Id.*

[56] *Id.* at 11, 24.

[57] *Id.* at 25.

proceeded with its plans to hire three new primary care physicians for 2012 and instead housed them at the main facility.[58] Lexington points to an internal email exchange of Janie Gilberti, Vice President of Primary Care and Hospital Medicine, who said that Ochsner "did not delay any new hires because we had signed contracts" and that she did not think "we lost revenue because we were able to find a space to move the physicians."[59] Thus, according to Lexington, Ochsner could not have lost any revenue in the first year, because it fully expanded its primary care practice as originally planned, despite the partial collapse of the new building.[60] Lexington asserts that Ochsner's claim that it delayed hiring "less than two full time equivalent physicians as a result of the collapse" is "a false claim directly contradicted by" Gilberti's email exchange, and states that Ochsner was not in a position to hire any more physicians until after the period of interruption for reasons unrelated to the collapse.[61]

## B.   *Ochsner's Opposition to the Motion*

Ochsner opposes Lexington's motion for summary judgment on Ochsner's claim for business interruption damages.[62] Ochsner states that its business interruption claim is proper under its insurance policy, as it is based on the loss of revenue it did not receive during the 17-month period of interruption from September 1, 2012 to January 1, 2014.[63] Additionally, Ochsner contends its coverage included an "Extended Period of Indemnity" provision that provides

---

[58] *Id.*

[59] *Id.* at 6.

[60] *Id.* at 3.

[61] *Id.* at 6, 25–26.

[62] Rec. Doc. 83.

[63] *Id.* at 2–3.

10

coverage needed to put a business back in the position it would have been in but for the loss.[64]

### 1.    Ochsner's "Downstream Revenue" Theory

First, Ochsner argues that downstream revenue is an accepted measurement of business losses in the healthcare industry.[65] Ochsner avers that the internal medicine clinic is part of its insured business, and thus revenue it loses as a result of the collapse forms a valid part of its business interruption claim.[66] Ochsner contends that it provided Lexington with "voluminous data" supporting its claim, with the original estimates based on projections derived from prior business performance and later estimates based on the actual revenue data from the period after the clinic opened.[67] According to Ochsner, in Louisiana, claimants under a business interruption insurance policy have "broad latitude" in proving their business interruption loss, and mathematical certainty is not required; rather, they only need to offer proof "as precise as the particular circumstances allow."[68] Ochsner states that a projection of earnings is an accepted method of calculating business interruption loss, as well as using data trends, historical performance, and pre-loss projections and budgets.[69]

Additionally, Ochsner asserts that its downstream losses calculations are neither remote nor speculative.[70] It includes patients who saw an internal medicine doctor and later received

---

[64] *Id.* at 3.

[65] *Id.* at 8.

[66] *Id.*

[67] *Id.*

[68] *Id.* (citing *Citadel Broadcasting Corp. v. Axis Insurance Co.*, 162 So. 3d 470, 475 (La. App. 4 Cir. 2015) (internal citations omitted)).

[69] *Id.* at 8–9.

[70] *Id.* at 9.

additional care from Ochsner, such as specialists, lab services, radiology, and more.[71] Ochsner argues that the causal connection is clearly supported from numerous witnesses and depositions "based upon the experience of Ochsner as well as accepted industry assumptions that expanded primary care results in expanded downstream care."[72] Ochsner contends that Lexington's own healthcare expert, Larry Hancock, used a study confirming that internal medicine doctors generate downstream revenue.[73] Ochsner represents that the study relied on by Hancock stated that the "historical rule of thumb" is that a primary care physician generates approximately $1 million in downstream revenue, while a primary care physician with 2,000 patients can provide $12 to $14 million.[74]

Moreover, Ochsner argues that Lexington accepted Ochsner's theory when it calculated its partial payment in June 2016, which used Ochsner's data on downstream revenue.[75] Ochsner also avers that the insurance policy lists types of remote and consequential damages which are not covered, and downstream revenue is not listed.[76] Ochsner represents that in *Safeguard Storage Properties, L.L.C. v. Donahue Favret Contractors, Inc.*, the Louisiana Fourth Circuit rejected a similar summary judgment argument by Lexington in a similar insurance case.[77] Ochsner represents that, in that case, a business sued Lexington for damages under a business interruption

---

[71] *Id.*

[72] *Id.* at 9–10.

[73] *Id.* at 10.

[74] *Id.*

[75] *Id.* at 16.

[76] *Id.* at 11.

[77] *Id.* (citing 60 So. 3d 110 (La. App. 4 Cir. 2011)).

policy after Hurricane Katrina prevented a planned expansion, and the Louisiana Fourth Circuit rejected Lexington's similar argument that the plaintiff's claim was "too speculative." [78] According to Ochsner, the court found that expert testimony supported the plaintiff's loss of business opportunity claim, and that attacking the credibility of those experts was more suitable for a trial on the merits.[79]

Ochsner further contends that Louisiana law "expressly rejects the customer-by-customer standard of proof that Lexington seeks to impose on Ochsner" by arguing that Ochsner has not provided evidence of specific patients who only visited a specialist because of a visit to a primary care physician.[80] According to Ochsner, "[c]ourts around the country," such as the Third Circuit, have also rejected Lexington's argument.[81] Moreover, Ochsner asserts that Lexington's own expert, Larry Hancock, testified that the "perfect system, tracking patient by patient, does not exist."[82] Ochsner argues that to allow Lexington to deny business losses coverage in the $550 million all risk insurance policy by demanding "an impossible level of proof" would render the policy illusory in contradiction to Fifth Circuit case law.[83] Moreover, Ochsner contends that Lexington accepted the "basic premise" of Ochsner's claim when Lexington made a partial

---

[78] *Id.*

[79] *Id.* at 11–12.

[80] *Id.* at 13.

[81] *Id.* (citing *Am. Med. Imaging Corp. v. St. Paul Fire & Marine Ins. Co.*, 949 F.2d 690, 694 (3d Cir. 1991); *Archer Daniels Midland Co. v. Aon Risk Servs., Inc.*, No. 97-2185, 2002 WL 31185884, at * 3 (D. Minn. Sept. 27, 2002)).

[82] *Id.* at 13–14.

[83] *Id.* at 15–16 (citing *Boston Old Colony Ins. Co. v. Tiner Assocs., Inc.*, 288 F.3d 222, 227 (5th Cir. 2002); *Ranger Insurance Company v. Culberson*, 454 F.2d 857, 864-65 (5th Cir. 1971); *Aladdin Oil Company v. Rayburn Well Service, Inc.*, 202 So. 2d 477, 489 (La. App. 4 Cir. 1967); *Mayer v. Laniri*, 97-2535 (La. App. 4 Cir. 3/11/98), 712 So. 2d 533, 535).

payment in June of 2016 by using "much of Ochsner's information and methodology."[84]

### 2.   Ochsner's "Period of Interruption" Time Frame Comparison

Second, Ochsner avers that the two timeframes it used are comparable and appropriate to consider, as the insurance policy requires Lexington to give "due consideration" to "the actual experience of the business after substantial completion and startup."[85] Ochsner asserts that the timeframes span two periods of identical length, and Ochsner's witnesses testified that the New Orleans market for primary care was static or shrinking during that time, the ratio of insured versus uninsured patients was steady, and there were no significant changes in payment rates.[86] Ochsner states that Lexington only offers a "laundry list of *possible* reasons" why Timeframe 1 and Timeframe 2 may not be comparable, but does not identify any evidence that proves its point or shows the data from Timeframe 2 is actually not comparable.[87]

### 3.   Ochsner's Claim for "Ramp Up" Losses

Third, Ochsner contends that the "ramp up" coverage of the extended period of indemnity provision is applicable here.[88] Ochsner avers that the extended period of indemnity provision provides coverage "for such additional length of time as is required to *restore the Insured's business to the condition that would have existed had no loss occurred* . . . ."[89] Ochsner states that extended period of indemnity coverage recognizes that a business does not immediately return to

---

[84] *Id.* at 16.

[85] *Id.* at 18.

[86] *Id.* at 19.

[87] *Id.* at 19–20 (emphasis in original).

[88] *Id.* at 20.

[89] *Id.* (emphasis in original).

previous profit levels after the damage is repaired.[90] Here, if no loss had occurred, Ochsner states that it would have opened on time in September 2012, and had a fully functioning business in February 2014 and each month after.[91] Instead, Ochsner argues it had "another ramp-up period" in the months after opening in February 2014, an additional loss to the business due to the delay.[92] Moreover, Ochsner asserts that its internal medicine practice was not "new," but rather a 70-year-old functioning practice covered by the insurance policy.[93] Thus, Ochsner avers that to put the business in the condition "had no loss occurred," Lexington must compensate Ochsner for the additional losses it suffered in the months after opening in February 2014.[94] Ochsner contends that Lexington misreads the insurance policy language by arguing that the extended period of indemnity coverage should be limited to coverage needed to get the business back to its prior level of production.[95]

### 4.    Ochsner's Decision to Hire Doctors from Residency Programs

Fourth, Ochsner further argues that the original opening date for the clinic, September 2012, was purposefully selected to coincide with the date that new doctors would finish their residency.[96] According to Ochsner, when the start date was pushed back to February 2014 by the

---

[90] *Id.*

[91] *Id.* at 20–21.

[92] *Id.*

[93] *Id.* at 22.

[94] *Id.*

[95] *Id.* at 21.

[96] *Id.* at 22–23.

collapse, it was forced to wait before the new residents were ready to start seeing patients.[97] Ochsner contends that the all risks insurance policy requires "due consideration" of the actual experience before and after the loss, which includes the "longstanding practice of hiring a majority of new internal medicine physicians out of residency."[98] Ochsner asserts that several witnesses also testified that there was a shortage of available primary care doctors, which is one of the main reasons doctors are hired fresh out of residency.[99] Accordingly, Ochsner argues the delay in opening the building during an "off hiring cycle" time in February instead of September "prevented Ochsner from conducting its business as it would in the absence of the loss."[100]

### 5.    Ochsner's Plan to Hire Additional Primary Care Physicians

Fifth, Ochsner asserts it had to "stall" recruiting due to the collapse because there was no space for additional providers, and Ochsner was able to hire additional providers once it had the additional space in the expanded clinic.[101] According to Ochsner, Janie Gilberti was not asked in her deposition about her email exchange regarding finding space for three physicians in the existing location, but that she did testify that she stalled hiring after the collapse.[102] Another witness also testified that there was a "revenue delay" and "loss" due to the lack of space to hire new physicians.[103]

---

[97] *Id.* at 23.

[98] *Id.*

[99] *Id.*

[100] *Id.* at 23–24.

[101] *Id.* at 24.

[102] *Id.*

[103] *Id.*

C.    *Lexington's Reply to Ochsner's Opposition*

Lexington states that Ochsner has failed to create any genuine issue of material fact on Lexington's motion for partial summary judgment on Ochsner's claim for business interruption damages.[104] First, Lexington re-asserts that Ochsner's downstream revenue calculation is flawed because it rests on a comparison of margins earned in two separate timeframes using different methodologies.[105] For example, Lexington argues that in Timeframe 1, Ochsner fails to include patients who visited a primary care physician in the 17 months prior to Timeframe 1, but includes in its Timeframe 2 calculation the downstream revenue associated with patients who visited a PCP doctor in the 17 months prior to Timeframe 2.[106] According to Lexington, this artificial deflation and inflation of the timeframes "renders meaningless any comparison" between the two.[107] Lexington states that Ochsner ignored this fatal calculation error in its opposition brief other than to say it involves factual disputes precluding summary judgment.[108]

Lexington further argues that it is not asking Ochsner to prove every single hypothetical transaction that did not occur because of the roof collapse to support its $28 million downstream revenue theory, but rather it must provide some information that would establish a direct causal connection between primary care physicians and downstream specialists.[109] Lexington asserts that

---

[104] Rec. Doc. 130.

[105] *Id.* at 3.

[106] *Id.* at 4.

[107] *Id.*

[108] *Id.*

[109] *Id.* at 5.

no reasonable juror could determine if there was any actual downstream revenue loss without information showing actual referrals from primary care physicians to downstream specialists.[110] According to Lexington, Ochsner has only asserted that downstream revenue could, in theory, result from primary care physicians; Lexington argues that Ochsner has not provided evidence, however, proving the loss.[111] Lexington points to the testimony of Ochsner's witnesses, who conceded that a patient could choose his or her own specialist without a referral and that such patients were included in Ochsner's calculations.[112] Lexington contends that its own expert, Larry Hancock, is critical of Ochsner attributing 100% of all revenue to its primary care physicians, stating that patients see specialists for other reasons besides primary care physician referrals and that specialists generate their own downstream revenue.[113] Lexington avers that other industry literature cautions against and contradicts Ochsner's downstream revenue model.[114] Lexington asserts that Louisiana law requires losses to be established "with reasonable certainty" and demonstrate a direct causal connection between the covered loss and the insured's damages, and Lexington alleges that Ochsner has not done so here.[115]

Lexington also argues that Ochsner's position that it is owed $7.5 million in additional damages for its "ramp up" period ignores the word "restore" in the insurance provision.[116] That

---

[110] *Id.*

[111] *Id.*

[112] *Id.* at 6.

[113] *Id.* at 6–7.

[114] *Id.* at 7.

[115] *Id.* at 7–8.

[116] *Id.* at 9.

is, Lexington asserts that the "Extended Period of Interruption" coverage is not based on gross earnings, but on the amount needed for "*restoration* of any level of prior business once the business *reopens*."[117] Lexington avers that Ochsner's business interruption claim is premised on the inability to hire new primary care physicians for its new clinic, but points out that these "new physicians, by definition, did not have any prior revenue that needed to be 'restored.'"[118]

Lexington further contends that Ochsner admits its business model was to hire both new doctors "*as well as* more experienced doctors," and that hiring new residents was Ochsner's choice.[119] According to Lexington, this decision triggers the insurance policy's mitigation provision, which requires Ochsner to take reasonable and necessary steps to mitigate losses from a covered peril.[120] Lexington states that Ochsner could have hired physicians who were able to start work in February 2014, but "offers no explanation for why it did not do so."[121] Finally, Lexington argues that the "undisputed facts" undermine Ochsner's claim that it stalled recruiting.[122] Lexington points again again to an email from Ochsner's executive, Janie Gilberti, stating that Ochsner did not delay any new hires, and her testimony that she had no additional applicants to consider.[123] Lexington states that it did not ask Gilberti about the email in her

---

[117] *Id.* (emphasis in original).

[118] *Id.* at 10.

[119] *Id.* at 11 (quoting Rec. Doc. 83 at 20).

[120] *Id.*

[121] *Id.*

[122] *Id.*

[123] *Id.*

deposition because it did not receive the evidence until after her deposition.[124]

### III. Law and Analysis

**A.    *Legal Standard for Summary Judgment***

Summary judgment is appropriate when the pleadings, the discovery, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[125] When assessing whether a dispute as to any material fact exists, the court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence."[126] All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment."[127] If the record, as a whole, "could not lead a rational trier of fact to find for the non-moving party," then no genuine issue of fact exists and the moving party is entitled to judgment as a matter of law.[128] The nonmoving party may not rest upon the pleadings, but must identify specific facts in the record and articulate the precise manner in which that evidence establishes a genuine issue for trial.[129]

The party seeking summary judgment always bears the initial responsibility of informing

---

[124] *Id.*

[125] Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

[126] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir. 2008).

[127] *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *Little*, 37 F.3d at 1075.

[128] *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986).

[129] *See Celotex*, 477 U.S. at 325; *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

the Court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.[130] Thereafter, the nonmoving party should "identify specific evidence in the record, and articulate" precisely how that evidence supports his claims.[131] To withstand a motion for summary judgment, the nonmoving party must show that there is a genuine issue for trial by presenting evidence of specific facts.[132] The nonmovant's burden of demonstrating a genuine issue of material fact is not satisfied merely by creating "some metaphysical doubt as to the material facts," "by conclusory allegations," by "unsubstantiated assertions," or "by only a scintilla of evidence."[133] Rather, a factual dispute precludes a grant of summary judgment only if the evidence is sufficient to permit a reasonable trier of fact to find for the nonmoving party. Hearsay evidence and unsworn documents that cannot be presented in a form that would be admissible in evidence at trial do not qualify as competent opposing evidence.[134]

**B.**     ***Legal Standard for Interpreting Insurance Contracts under Louisiana Law***

Under Louisiana law, "an insurance policy is a contract between the parties and should be construed by using the general rules of interpretation of contracts set forth in the Louisiana Civil Code."[135] "The Louisiana Civil Code provides that '[t]he judiciary's role in interpreting insurance

---

[130] *Celotex*, 477 U.S. at 323.

[131] *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994), *cert. denied*, 513 U.S. 871 (1994).

[132] *Bellard v. Gautreaux*, 675 F.3d 454, 460 (5th Cir. 2012) (citing *Anderson v. Liberty*, 477 U.S. 242, 248–49 (1996)).

[133] *Little*, 37 F.3d at 1075.

[134] *Martin v. John W. Stone Oil Distrib., Inc*., 819 F.2d 547, 549 (5th Cir. 1987); Fed. R .Civ. P. 56(c)(2).

[135] *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 206 (5th Cir. 2007) (quoting *Cadwallader v. Allstate Ins. Co.*, 848 So.2d 577, 580 (La. 2003)); *Mark v. Sunshine Plaza, Inc.*, No. 16-455, 2016 WL 6876645, at *2 (E.D. La. Nov. 22, 2016) (Morgan, J.) (quoting *Wisznia Co. v. Gen. Star Indem. Co.*, 759 F.3d 446, 448 (5th Cir. 2014) (quoting *Mayo v. State farm Mut. Auto. Ins. Co.*, 2003-1801, at 3 (La. 2/25/04); 869 So.2d 96, 99)) (quotation marks

contracts is to ascertain the common intent of the parties to the contract' by construing words and phrases 'using their plain, ordinary and generally prevailing meaning.'"[136] "Interpretation of an insurance contract generally involves a question of law."[137]

　　If the contract is clear and unambiguous and does not have absurd consequences, the court applies the ordinary meaning of the contractual language.[138] If the insurance policy contains ambiguous provisions, the "[a]mbiguity . . . must be resolved by construing the policy as a whole; one policy provision is not to be construed separately at the expense of disregarding other policy provisions."[139] "An insurance contract, however, should not be interpreted in an unreasonable or strained manner under the guise of contractual interpretation to enlarge or restrict its provisions beyond what is reasonably contemplated by unambiguous terms or achieve an absurd conclusion."[140] "Courts lack the authority to alter the terms of insurance contracts under the guise of contractual interpretation when the policy's provisions are couched in unambiguous terms."[141]

## C.　Analysis

　　Lexington argues that it is entitled to partial summary judgment on all or certain portions of Ochsner's claim for business interruption damages.[142] The Court will address each of

---

omitted) (alterations omitted).

[136] *Wisznia Co.*, 759 F.3d at 448–49 (quoting *Mayo,* 2003–1801, at 3 (La.2/25/04); 869 So.2d at 99 (citing La. Civ. Code arts. 2045, 2047)).

[137] *In re Katrina Canal Breaches Litig.*, 495 F.3d at 206 (citing *Bonin v. Westport Ins. Corp.*, 930 So.2d 906, 910 (La. 2006)).

[138] *Prejean v. Guillory*, 2010-0740, at 6 (La. 7/2/10); 38 So. 3d 274, 279; *see also Sapp v. Wood Grp. PSN, Inc.*, No. 15-3, 2016 WL 6995897, at *4 (E.D. La. Nov. 30, 2016) (Brown, J.)).

[139] *In re Katrina Canal Breaches Litig.*, 495 F.3d at 207 (quoting *La. Ins. Guar. Assoc. v. Interstate Fire & Cas. Co.*, 630 So.2d 759, 763 (La. 1994)).

[140] *Id.* at 208 (quoting *Cadwallader v. Allstate Ins. Co.*, 848 So.2d 577, 580 (La. 2003)).

[141] *Id.*

[142] Rec. Doc. 63-1 at 2–3.

Lexington's arguments in turn.

### 1.      Ochsner's "Downstream Revenue" Theory

First, Lexington argues that Ochsner's "downstream revenue" damages claim is too speculative and relies on flawed methodology, and thus summary judgment on it is proper.[143] Lexington avers that Ochsner has not presented sufficient causation evidence to establish that every time a patient sees a specialist after seeing a primary care physician, the specialist visit revenue should be attributed to the primary care physician.[144] Lexington argues that Ochsner has offered no evidence that any particular patient would not have seen an Ochsner specialist but for an earlier visit to an Ochsner primary care physician.[145] Lexington also points out that Ochsner still attributes a specialist visit to a primary care physician visit even if significant amount of time passed between the two visits or if the medical treatments received at each visit are entirely unrelated.[146]

Lexington further asserts that Ochsner uses different groups of patients for calculating revenue in Timeframe 1 (the 17 month period after the roof collapse that is covered by the insurance policy) and Timeframe 2 (the first 17 months after opening the clinic).[147] In particular, Lexington alleges that Ochsner counts the "downstream revenue" of specialist visits in Timeframe 2 if the prior primary care physician visit occurred in either Timeframe 1 or 2, while Ochsner only counts the "downstream revenue" of specialist visits in Timeframe 1 if the primary care physician visit occurred in Timeframe 1; Lexington contends that Ochsner should have included all primary care physician visits in Timeframe 1 and 17 months prior to Timeframe 1 in its calculation as it

---

[143] *Id.* at 2, 8–9.

[144] *Id.* at 9.

[145] *Id.* at 2, 9, 15.

[146] *Id.* at 15–16.

[147] *Id.* at 16.

did with Timeframe 2.[148] Lexington alleges that if Ochsner had used the same methodology of a
34-month window for both timeframes, Ochsner would have included hundreds or thousands more
specialist visits for Timeframe 1 that would have reduced or eliminated the alleged "downstream
revenue" loss.[149]

In response, Ochsner points out that "downstream revenue" is an accepted measurement of
business losses in the healthcare industry, and argues that it provided Lexington with "voluminous
data" supporting its claim.[150] According to Ochsner, this included estimates based on projections
from prior business performance and estimates based on the actual revenue data from the period
after the clinic opened.[151] Ochsner points out that several of its witnesses testified in support of
the acceptability of its "downstream revenue" damages claim.[152] For example, Ochsner avers that
its healthcare expert, Charlotte Kohler, testified that the "primary care doctor coordinates and
directs the care of the downstream providers."[153] According to Ochsner, Lexington asserted a
similar argument in an unrelated case, *Safeguard Storage Properties, L.L.C. v. Donahue Favret
Contractors, Inc.*, where a company sued under a business interruption policy after Hurricane
Katrina prevented a planned business expansion.[154] Ochsner represents that the Louisiana Fourth
Circuit rejected Lexington's argument that the business interruption damages claims for future
locations were too speculative, and held that Lexington's attacks on the plaintiff's expert report

---

[148] *Id.* at 17.

[149] *Id.*

[150] Rec. Doc. 83 at 8.

[151] *Id.*

[152] *Id.* at 10.

[153] *Id.* (citing Rec. Doc. 83-13 at 5–9).

[154] *Id.* at 11–12 (citing 60 So. 3d 110 (La. App. 4 Cir. 2011)).

24

involved an "intensely factual determination" and was an issue to be decided at trial.[155]

Under Louisiana law, damages for loss of profits may not be based on speculation and conjecture.[156]  However, as Louisiana courts have held, "such damages need be proven only within *reasonable certainty* . . . [b]road latitude is given in proving lost profits because this element of damages is often difficult to prove and *mathematical certainty or precision is not required*."[157] "Accordingly, where it is not possible to state or prove a perfect measure of lost earnings, 'courts have reasonable discretion to assess damages based upon all the facts and circumstances of the case.'"[158]  "Proof of such losses need only be as precise as circumstances in a particular situation allow."[159]

Here, the insurance policy's business interruption provision provides that Lexington must cover the "actual loss sustained by the insured during the Period of Interruption directly resulting from a Covered Cause of Loss to Insured Property."[160]  In order to determine the amount of loss payable under this provision, the insurance policy states that "due consideration shall be given to the experience of the business before the Period of Interruption and the probable experience thereafter had no loss occurred."[161]  Section V(B)(3) of the insurance policy notes that for property

---

[155] *Id.* (quoting *Safeguard Storage Properties, L.L.C.*, 60 So. 3d at 121).

[156] *La Louisiane Bakery Co. v. Lafayette Ins. Co.*, 09-825 (La. App. 5 Cir. 2/8/11), 61 So. 3d 17, 34.

[157] *Id.* (emphasis added) (citing *Cox Commc'ns v. Tommy Bowman Roofing, LLC*, 04–1666, at 8 (La. App. 4 Cir. 3/15/06), 929 So.2d 161, 166–67; *Louisiana Farms v. Louisiana Depart't of Wildlife and Fisheries,* 95–845, at 36 (La. App. 3 Cir. 10/9/96), 685 So.2d 1086, 1105; *Lavigne v. J. Hofert Co.*, 431 So.2d 74, 77 (La. App. 1 Cir. 1983)).

[158] *Cotton Bros. Baking Co. v. Indus. Risk Insurers*, 774 F. Supp. 1009, 1028 (W.D. La. 1989) (quoting *Tide Craft, Inc. v. Red Ball Oxygen Co.,* 514 So.2d 664 (La. App. 2 Cir. 1987)), *aff'd as modified*, 941 F.2d 380 (5th Cir. 1991), *as amended on denial of reh'g* (Oct. 10, 1991), *opinion corrected on reh'g sub nom. Cotton Bros. Baking Co. v. Indus. Risk Insurers*, 951 F.2d 54 (5th Cir. 1992).

[159] *Citadel Broad. Corp. v. Axis U.S. Ins. Co.*, 2014-0326 (La. App. 4 Cir. 2/11/15), 162 So. 3d 470, 475.

[160] Rec. Doc. 63-2 at 87.

[161] *Id.* at 88.

under construction, "due consideration will be given to the actual experience of the business compiled after substantial completion and start-up."[162]

Ochsner contends that it has produced sufficient evidence of its actual losses sustained for its business interruption loss claim to survive summary judgment.[163] Ochsner argues that it has supported its "downstream revenue" damages claim with sufficient "industry-standard evidence," including: (1) projections based on past experience;[164] (2) industry publications and studies;[165] (3) the actual experience of the business after the clinic was eventually opened;[166] and (4) back-up data, which was provided to Lexington to use for its own calculations.[167] Ochsner also points to the supporting testimony of its experts and its executives who Ochsner contends have significant healthcare experience.[168] For example, Ochsner points to the deposition of Michael Hulefeld, Ochsner's Chief Operating Officer, who testified that he is "completely" confident that primary care physician visits result in downstream revenue for Ochsner, and that he "can't think of an

---

[162] *Id.* at 89.

[163] Rec. Doc. 83 at 3.

[164] *See id.* at 5 (stating that Ochsner provided Lexington and HSNO with its own projections on how much revenue it would have made but for the loss); Rec. Doc. 83-7 at 27 (Ochsner's expert Frank Bocklud testifying in his deposition that Ochsner provided Lexington with the contribution margin based on 2012 data); Rec. Doc. 83-8 at 5 (Ochsner executive Bobby Brannon stating in his deposition that Ochsner offered Lexington information on its business losses as early as October of 2013).

[165] *See* Rec. Doc. 83-5 at 3–4 (HSNO employee Peter Fogarty discussing in his deposition that the Merritt Hawkins survey reflected that primary care physicians tend to generate more revenue, including downstream revenue); Rec. Doc. 83-14 at 9 (study stating that the "historical rule of thumb is that each primary care physician provides approximately $1 million of downstream referral revenue for hospitals" and up to $12 million to $14 million if they manage 2,000 patients).

[166] *See* Rec. Doc. 83 at 5 (Ochsner asserting that it provided Lexington with the "actual data to support the claim rather than the projections discussed in the early days"); *id.* at 6 (Ochsner alleging that it provided Lexington with the actual patient revenue by January 2016); Rec. Doc. 83-3 at 2 (Ochsner's accounting expert, George Panzeca, stating that he provided Lexington with an expert report considering and measuring the revenues produced in the two timeframes).

[167] *Id.* at 1.

[168] *Id.* at 2, 17–18. *See* Rec. Doc. 83-3 at 2 (Ochsner's accounting expert, George Panzeca, testifying that he compared the two timeframes).

instance where it hasn't."[169]   Likewise, Ochsner's healthcare expert, Charlotte Kohler, testified in her deposition that primary care physicians directs a patient's care and are involved with the services provided by downstream providers.[170]

The Court finds that Ochsner has submitted sufficient evidence in support of its "downstream revenue" claim to preclude summary judgment on this issue. While Lexington points to several alleged flaws in Ochsner's methodology and calculations, these factual disputes are suitable issues for trial and more properly addressed through cross examination.[171]   For example, Lexington argues that Ochsner improperly attributes every specialist visit that occurred after a primary care physician visit as "downstream revenue," and raises several scenarios where the two visits would be unrelated or are too attenuated and thus should not be included in a "downstream revenue" calculation.[172]   Likewise, Lexington alleges that Ochsner used different patient groups when calculating revenue in Timeframe 1 and Timeframe 2, such that Ochsner would have found a greater number of specialist visits in Timeframe 1 if it had used the same calculation as it did in Timeframe 2.[173]   However, even if the Court accepts Lexington's allegations as true, Lexington has provided no evidence as to how over-inclusive Ochsner's calculation may be, and thus provides no basis for the Court to find that Ochsner's "downstream revenue" claim is too speculative and fails as a matter of law.

---

[169]   Rec. Doc. 83-10 at 15.

[170]   Rec. Doc. 83-13 at 9.

[171]   *See Safeguard Storage Properties, L.L.C. v. Donahue Favret Contractors, Inc.*, 2010-0673 (La. App. 4 Cir. 3/31/11), 60 So. 3d 110, 121 ("However, attacking the credibility of Safeguard's expert reports regarding the loss of business opportunities and determining the monetary amount of lost business opportunities, which is an intensely factual determination, are suitable issues for a trial on the merits."); *see also Ross v. Travelers Indem. Co.*, 325 A.2d 768, 771–72 (Me. 1974) (stating that arguments that an insured's estimate of damages failed to include all relevant costs and figures were more appropriate for cross-examination).

[172]   Rec. Doc. 63-1 at 14–16.

[173]   *Id.* at 16–17.

In *Blis Day Spa, L.L.C. v. Hartford Insurance Group*, a court in the Western District of North Carolina rejected a similar argument by an insurance company that the insured party overestimated the revenue generated before, during, and after the period of interruption, and found that it could not conclude as a matter of law that the plaintiff's estimate was unduly speculative.[174] Similarly, in *Citadel Broadcast Corporation v. Axis U.S. Insurance Company*, the Louisiana Fourth Circuit rejected an insurer's argument that an insured must prove its business interruption loss on a customer-by-customer basis, and found that such a standard would be "overly burdensome" and more than the "due consideration" requirement to prove actual loss sustained under the plaintiff's insurance policy.[175]

As stated *supra*, "mathematical certainty or precision is not required" to assess business interruption loss damages, and Ochsner has pointed to sufficient evidence, including expert testimony, projections, industry surveys, and actual financial data, to establish "with reasonable certainty" its "downstream revenue" damages claim.[176] Both parties have presented conflicting expert testimony and evidence, and thus a genuine dispute of material fact exists precluding summary judgment.[177] The Court cannot conclude as a matter of law that Ochsner's claim is unduly speculative or that Ochsner has not established its "downstream revenue" damages with reasonable certainty. Therefore, the Court denies Lexington's instant motion for partial summary judgment on the "downstream revenue" portion of Ochsner's business interruption loss damages

---

[174] 427 F. Supp. 2d 621, 630 (W.D. N.C. 2006).

[175] 2014-0326 (La. App. 4 Cir. 2/11/15), 162 So. 3d 470, 475.

[176] *See La Louisiana Bakery Co. v. Lafayette Ins. Co.*, 09-825 (La. App. 5 Cir. 2/8/11), 61 So. 3d 17, 34 (citing *Cox Communic'ns v. Tommy Bowman Roofing, LLC*, 04–1666, at 8 (La. App. 4 Cir. 3/15/06), 929 So.2d 161, 166–67; *Louisiana Farms v. Louisiana Dep't of Wildlife and Fisheries*, 95–845, at 36 (La. App. 3 Cir. 10/9/96), 685 So.2d 1086, 1105; *Lavigne v. J. Hofert Co.*, 431 So.2d 74, 77 (La. App. 1 Cir. 1983)).

[177] *See Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) ("When considering summary judgment evidence, we must . . . 'not weigh the evidence or evaluate the credibility of witnesses.'") (citations omitted); *La Louisiane Bakery Co.*, 09-825 (La. App. 5 Cir. 2/8/11), 61 So. 3d at 35 ([C]redibility determinations, including evaluating expert witness testimony, are for the trier of fact.").

claim.

### 2.     Ochsner's "Period of Interruption" Time Frame Comparison

Second, Lexington argues that Ochsner's comparison of Timeframe 1 and Timeframe 2 "is legally and factually insupportable," and thus summary judgment on it is proper.[178] In particular, Lexington alleges that Ochsner has not shown that the two time periods are actually comparable, as many external factors, such as the Affordable Care Act implementation and changes in healthcare services, patient demand, and reimbursement rates, make such a comparison "speculative at best."[179] Lexington asserts that Ochsner has not offered any evidence that the two timeframes are comparable.[180] Lexington contends that, "[i]n short, there are simply too many variables influencing the overall profitability of a healthcare enterprise to allow a simple comparison of a practice's revenues from two timeframes."[181]

In response, Ochsner asserts that the timeframes are comparable and summary judgment on this issue should be denied, as: (1) both timeframes span periods of identical length with similar months and holiday seasons;[182] (2) Frank Bocklud, one of Ochsner's experts, testified in his deposition that New Orleans had "a static or shrinking [primary care] market" and was "not growing like a Houston, where they are getting a lot of new people in and new patients;"[183] (3) Michael Hulefeld, an Ochsner executive, stated in his deposition that the ratio of insured to uninsured patients was "steady" between the two timeframes;[184] and (4) Charlotte Kohler,

---

[178] Rec. Doc. 63-1 at 18.

[179] *Id.* at 10.

[180] *Id.* at 18–19.

[181] *Id.* at 19.

[182] Rec. Doc. 83 at 19.

[183] *See* Rec. Doc. 83-7 at 17; Rec. Doc. 83 at 19.

[184] Rec. Doc. 83-10 at 7; Rec. doc. 83 at 19–20.

Ochsner's healthcare expert, testified that there were no significant changes in payment rates either.[185] Ochsner argues that Lexington only offers a "laundry list of *possible* reasons" why Timeframe 1 and Timeframe 2 may not be comparable, but does not identify any evidence that proves its point or shows the data from Timeframe 2 is actually not comparable.[186]

The Court finds that Ochsner has submitted sufficient evidence in support of its claim that it is entitled to business interruption loss damages to preclude summary judgment on this issue as well. As stated *supra*, Louisiana law does not require Ochsner to prove its business loss damages to an absolute certainty.[187] Likewise, the insurance policy requires that "due consideration . . . be given to the actual experience of the business compiled after substantial completion and start-up."[188] Ochsner has pointed to sufficient evidence, including expert and lay witness testimony, to create a genuine dispute of material fact precluding summary judgment on its damages claim based on a comparison of Timeframe 1 and Timeframe 2.[189] The Court cannot conclude as a matter of law that Ochsner's comparison of the two timeframes is so speculative as to warrant summary judgment. Therefore, the Court denies Lexington's instant motion for partial summary judgment to the extent that it seeks to dismiss Ochsner's business interruption claim for damages due to its use of a comparison between Timeframe 1 and Timeframe 2.

### 3.      Ochsner's Claim for "Ramp Up" Losses

Third, Lexington argues that summary judgment is proper on Ochsner's $7.5 million

---

[185] Rec. Doc. 83-13 at 11; Rec. Doc. 83 at 20.

[186] *Id.* at 19–20 (emphasis in original).

[187] *La Louisiane Bakery Co. v. Lafayette Ins. Co.*, 09-825 (La. App. 5 Cir. 2/8/11), 61 So. 3d 17, 34.

[188] Rec. Doc. 63-2 at 89.

[189] *See Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) ("When considering summary judgment evidence, we must . . . 'not weigh the evidence or evaluate the credibility of witnesses.'") (citations omitted); *La Louisiane Bakery Co. v. Lafayette Ins. Co.*, 09-825 (La. App. 5 Cir. 2/8/11), 61 So. 3d 17, 35 ("[C]redibility determinations, including evaluating expert witness testimony, are for the trier of fact.").

damages claim for revenue losses during the post-opening "ramp up" period.[190] According to Lexington, the insurance policy only permits recovery of post-opening losses up to three months when necessary to "restore" Ochsner's business to "the condition that would have existed had no loss occurred."[191] Lexington argues that the term "restore" is defined as putting something back into existence or returning something "to an *earlier* or *original* condition by repairing it, cleaning it, etc."[192] Here, Lexington contends that Ochsner was *expanding* its business that did not exist as of September 2012, and thus was not covered by the insurance policy because there was nothing to "restore."[193] Lexington avers that the collapse did not prevent any existing primary care physicians from operating at the same level as they had been prior to the collapse, and that Ochsner admits that there is no evidence that the collapse caused Ochsner to lose any patients either.[194] Lexington alleges that Ochsner's "ramp up" damages claim would constitute a windfall, which is contrary to the purpose of business interruption insurance coverage to bring a business to the same financial condition as existed before the loss.[195]

In response, Ochsner argues that if the roof collapse had not occurred, its new clinic would have opened on time in September 2012 and would have been a fully functioning business in February 2014 and each month after.[196] Instead, Ochsner avers that it had "another ramp-up period" in the months after opening in February 2014 in addition to the ramp up period Lexington

---

[190] Rec. Doc. 63-1 at 3, 10, 21–23.

[191] *Id.*

[192] *Id.* at 21 (emphasis in original).

[193] *Id.*

[194] *Id.* at 22.

[195] *Id.* at 23 (citing *United Land Invs., Inc. v. N. Ins. Co. of Am.*, 476 So. 2d 432, 436 (La. App. 1985); *Dictiomatic, Inc. v. U.S. Fid. & Guar. Co.*, 958 F. Supp. 594, 604–05 (S.D. Fla. 1997).

[196] Rec. Doc. 83 at 20–21.

must compensate for that would have occurred in September 2012, which constitutes an additional business loss.[197]  Moreover, Ochsner asserts that its internal medicine practice was not "new," but rather a 70 year old functioning practice covered by the insurance policy issued to its existing business, "Ochsner Clinic Foundation."[198]  Thus, Ochsner avers that to put the business in the condition "had no loss occurred," Lexington must compensate Ochsner for the additional losses it suffered in the months after opening in February 2014.[199]  Ochsner contends that Lexington misreads the insurance policy language by arguing that the extended period of indemnity coverage should be limited to coverage needed to get the business back to its prior level of production.[200]

As stated *supra*, "[t]he Louisiana Civil Code provides that '[t]he judiciary's role in interpreting insurance contracts is to ascertain the common intent of the parties to the contract' by construing words and phrases 'using their plain, ordinary and generally prevailing meaning.'"[201] If the contract is clear and unambiguous and does not have absurd consequences, the court applies the ordinary meaning of the contractual language.[202]  "Courts lack the authority to alter the terms of insurance contracts under the guise of contractual interpretation when the policy's provisions are couched in unambiguous terms."[203]  The insurance policy at issue in this case is an "all risk" policy, which creates "a special type of coverage that extends to risks not usually covered under

---

[197] *Id.*

[198] *Id.* at 22.

[199] *Id.*

[200] *Id.* at 21.

[201] *Wisznia Co.*, 759 F.3d at 448–49 (quoting *Mayo v. State Farm Mut. Auto. Ins. Co.*, 2003–1801, at 3 (La.2/25/04); 869 So.2d 96, 99 (citing La. Civ. Code arts. 2045, 2047)).

[202] *Prejean v. Guillory*, 2010-0740, at 6 (La. 7/2/10); 38 So. 3d 274, 279; *see also Sapp v. Wood Grp. PSN, Inc.*, No. 15-3, 2016 WL 6995897, at *4 (E.D. La. Nov. 30, 2016) (Brown, J.)).

[203] *In re Katrina Canal Breaches Litig.*, 495 F.3d at 208 (quoting *Cadwallader v. Allstate Ins. Co.*, 848 So.2d 577, 580 (La. 2003)).

other insurance."[204] Insurers are permitted to limit their liability under all-risk policies, but "[e]xclusionary provisions in insurance contracts are strictly construed against the insurer, and any ambiguity is construed in favor of the insured."[205]

Pursuant to Section V(C)(8) of Ochsner's insurance policy, the "Extended Period of Indemnity" provision at issue here, Lexington is obligated to provide coverage "for such additional length of time as is required to *restore the insured's business to the condition that would have existed had no loss occurred* . . . ."[206] The insurance policy clarifies that the extended period of indemnity lasts for 90 days,[207] and both parties appear to agree that the extended indemnity provision was triggered on the day Ochsner's clinic opened following the roof collapse.[208] The insurance policy also excludes from all coverage any "[i]ndirect, remote, or consequential loss or damage."[209]

While the parties dispute whether or not the extended period of indemnity applies in this instance to Ochsner's new clinic, the Court finds that the provision is not ambiguous, and thus will apply the ordinary meaning of the contractual language.[210] Lexington primarily focuses on the term "restore," and argues that "restore" is defined as putting something back into existence or returning something "to an *earlier* or *original* condition by repairing it, cleaning it, etc."[211]

---

[204] *Id.*

[205] *Id.* (quoting *Ledbetter v. Concord Gen. Corp.*, 665 So.2d 1166, 1169 (La. 2006) (citing *Garcia v. St. Bernard Parish Sch. Bd.*, 576 So.2d 975, 976 (La. 1991))).

[206] Rec. Doc. 83-1 at 19 (emphasis added).

[207] *Id.* at 7.

[208] Rec. Doc. 83 at 21 (Ochsner stating that the extended period of indemnity coverage applied on February 2014, the month that Ochsner's internal medicine clinic opened); Rec. Doc. 63-1 at 21 (Lexington stating that the extended period of indemnity coverage begins "once a damaged property reopens and normal business resumes.")

[209] Rec. Doc. 83-1 at 10; Rec. Doc. 63-1 at 5.

[210] *Prejean*, 2010-0740, at 6; 38 So. 3d at 279; *Wisznia Co.*, 759 F.3d at 448–49.

[211] Rec. Doc. 63-1 at 21 (emphasis in original).

However, such an interpretation ignores the rest of the clause. The "Extended Period of Indemnity" provision explicitly covers losses needed to "restore" a business "to the condition that would have existed had no loss occurred," and not, as Lexington suggests, to "restore" a business back to its pre-loss condition or to allow a business "to get back to its prior level of production."[212] Lexington's interpretation misconstrues the unambiguous contractual language and interprets part of the extended period of indemnity clause in a way that would disregard the rest of the provision.[213]

Ochsner's interpretation, by contrast, properly comports with the language of the provision. Ochsner's "ramp up" cost damages claim seeks to put Ochsner in the position that would have existed had no loss occurred, *i.e.* opening the clinic in September 2012 and being fully operational by February 2014. In addition, the Court notes that Ochsner's interpretation is consistent with the plain meaning of "restore," which the Supreme Court has recognized means to "give back (as something lost or taken away)" and "bring back into existence or use; reestablish."[214] Thus, the contractual provision requires Lexington to restore to Ochsner what was lost by the roof collapse, *i.e.* Ochsner's condition that would have existed had the roof not collapsed, rather than restore its business to its pre-loss condition as Lexington avers.

Neither case cited by Lexington supports its argument or changes the plain language of the contract.[215] For example, Lexington cites *Safeguard Storage Properties, L.L.C v. Donahue Favret Contractors, Inc.*, where the Louisiana Fourth Circuit held that "[t]he extended period begins when

---

[212] Rec. Doc. 83-1 at 19, 21.

[213] *In re Katrina Canal Breaches Litig.*, 495 F.3d at 207; La. Civ. Code art. 2050 (1987) ("Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole.").

[214] *Logan v. United States*, 552 U.S. 23, 31 n.3 (2007) (quoting Webster's Third New International Dictionary 1936 (1993); American Heritage Dictionary 1486 (4th ed. 2000)).

[215] Rec. Doc. 63-1 at 22.

34

the damaged properties are actually repaired . . . and ends when the business *returns to pre-loss conditions*."[216]   However, in that case the parties were disputing the length of time that was covered by the extended period of indemnity in that specific contract, and not whether an extended indemnity provision would apply to a new expansion of an existing business.[217]   Moreover, despite the fact that the plaintiff was seeking coverage for lost business development opportunities for future stores, the Louisiana Fourth Circuit found that the issue of when the extended period of recovery began was a question of fact to be determined at trial, and not, as Lexington would have this Court find, that such recovery is precluded because no business existed pre-loss.[218] Additionally, Lexington points to *Home Indemnity Company v. Hyplains Beef, L.C.*, where a federal court in the District of Kansas interpreted a mitigation provision of an insurance contract.[219] However, in that case, the contract specified that a business must "resume" operations as quickly as possible to mitigate its damages, which the court interpreted to only apply to complete stoppages of operations and not slowdowns.[220]   Here, however, Ochsner's contract specifies that additional coverage would be provided to "restore" Ochsner to the condition that "would have existed had no loss occurred."

The parties also dispute whether Ochsner's clinic should be considered an expansion of a business, as Lexington avers,[221] or if Ochsner's claim involves Ochsner's 70-year-old internal medicine business and "Ochsner Clinic Foundation," the insured business.[222]   However, even if

---

[216] *Id.* (quoting 2010-0673 (La. App. 4 Cir. 3/31/11), 60 So. 3d 110, 122) (emphasis in original).

[217] *Safeguard Storage Props.,* 2010-0673, at *18–19, 60 So. 3d at 122–23.

[218] *Id.*

[219] Rec. Doc. 63-1 at 22 (citing *893* F. Supp. 987, 993 (D. Kan. 1995), *aff'd*, 89 F.3d 850 (10th Cir. 1996)).

[220] *Home Indem. Co.*, 893 F. Supp. at 993.

[221] Rec. Doc. 63-1 at 22.

[222] Rec. Doc. 83 at 22.

Lexington's characterization of Ochsner's clinic is correct, the Court notes that the insurance contract does not contain any provision limiting its "Extended Period of Indemnity" clause to interruptions of existing businesses only, as opposed to new expansions.[223] As stated *supra*, "[e]xclusionary provisions in insurance contracts are strictly construed against the insurer," and Lexington does not present sufficient evidence that Ochsner's damages claim for "ramp up" costs falls under any exclusionary clause in the insurance contract.[224] The terms of the contract clearly contemplate that Ochsner can seek an additional coverage of 90 days after the clinic opened to reach the condition that would have existed had no loss occurred, and Lexington has not presented any evidence to demonstrate that Ochsner's "ramp up" cost damages would constitute a windfall beyond that condition or otherwise violate the insurance contract.

Thus, the Court finds that Ochsner has submitted sufficient evidence in support of its claim that it is entitled to "ramp up" costs under the insurance contract to preclude summary judgment on this issue. Lexington has failed to point to any evidence or provision of the contract that excludes expansion of businesses from coverage under the "Extended Period of Indemnity" clause. Therefore, the Court denies Lexington's instant motion for partial summary judgment to the extent that it seeks to dismiss Ochsner's damages claim for "ramp up" costs.

### 4.    Ochsner's Decision to Hire Doctors from Residency Programs

Fourth, Lexington avers that Ochsner seeks $3.8 million because the two new primary care physicians it hired could not begin working until several months after the clinic opened when their residency programs were finished, and Lexington asserts that summary judgment on this claim is proper.[225] According to Lexington, Ochsner had planned on opening the clinic in September 2012,

---

[223] Rec. Doc. 83-1 at 10

[224] *Id.* (quoting *Ledbetter v. Concord Gen. Corp.*, 665 So.2d 1166, 1169 (La. 2006) (citing *Garcia v. St. Bernard Parish Sch. Bd.*, 576 So.2d 975, 976 (La. 1991))).

[225] Rec. Doc. 63-1 at 3, 23–24.

which coincides with the normal completion of doctors' summer residency programs, but failed to hire doctors who could immediately start for the February 2014 opening of the clinic.[226] Lexington argues that this further delay was caused by Ochsner's own business decision to hire doctors from residency programs rather than ones who could start immediately in February 2014, and was not caused by the roof collapse.[227] Lexington points to Frank Bocklud's deposition testimony, who conceded that hiring physicians out of a residency program was "a choice [Ochsner] made," and to Gilberti's deposition testimony, who stated that Ochsner had previously hired three physicians outside residency programs.[228] Lexington argues that Ochsner breached its duty to mitigate its losses from the roof collapse when it "needlessly waited seven months to hire two [primary care physicians] off the residency cycle," causing its own delay.[229] Lexington further contends that this is only a hypothetical projection of what Ochsner says "would have happened," whereas the insurance policy only requires "due consideration" of Ochsner's "actual experience" post-opening.[230]

In response, Ochsner contends that its business model uses both new doctors outside residency as well as more experienced doctors.[231] Ochsner cites to the deposition of Frank Bocklud, who stated that out of the four physicians it hired, only two from the residency programs were significantly delayed and thus included in its business loss calculation.[232] Ochsner further argues that the original opening date for the clinic, September 2012, was purposefully selected to

---

[226] *Id.* at 23–24.

[227] *Id.*

[228] *Id.* at 24 (citing Rec. Doc. 63-4 at 36).

[229] *Id.* at 25.

[230] *Id.*

[231] Rec. Doc. 83 at 22.

[232] *Id.* at 21–22 & n.88 (citing Rec. Doc. 83-7 at 12).

coincide with the date that new doctors would finish their residency.[233] Ochsner contends that the all risks insurance policy requires "due consideration" of the actual experience before and after the loss, which includes the "longstanding practice of hiring a majority of new internal medicine physicians out of residency."[234] Ochsner points out that Michael Hulefeld testified that "there is a national shortage of primary care doctors;"[235] likewise, Charlotte Kohler, Ochsner's healthcare expert, testified that once a physician has been hired by a hospital, the hospital "[is] going to try to keep that doctor, because they are hard in the marketplace. The marketplace—everybody wants primary care [physicians] because of their revenue generating potential."[236] Additionally, Janie Gilberti testified in her deposition that "existing doctors are harder to come by" and that existing primary care physicians "are not looking to leave and abandon [their] patients."[237] Ochsner avers that this difficulty in hiring experienced doctors is "one of the main reasons that doctors are hired fresh out of residency."[238] Thus, Ochsner argues that delay caused the clinic to open during an "off hiring cycle" time in February instead of September "prevented Ochsner from conducting its business as it would in the absence of the loss."[239]

Pursuant to Section V(A)(2) of the insurance policy, Ochsner may recover the "actual loss" it suffered if it was "unable . . . [t]o continue business operations or services . . . obtainable from other sources."[240] Lexington argues that this imposed on Ochsner a duty to mitigate its losses from

---

[233] *Id.* at 22–23.

[234] *Id.*

[235] *Id.* at 23 (citing Rec. Doc. 83-10 at 9).

[236] *Id.* (citing Rec. Doc. 83-13 at 3–4).

[237] Rec. Doc. 83-12 at 9.

[238] Rec. Doc. 83 at 23.

[239] *Id.*

[240] Rec. Doc. 83-1 at 16.

the roof collapse.[241] Considering the foregoing evidence, the Court finds that both parties have presented conflicting testimony regarding whether primary care physicians could have been obtained from "other sources" besides residency programs. Ochsner presents expert and lay testimony that hiring physicians from residency programs was part of its business model, that hiring experienced physicians outside of residency programs was more difficult, and that there was a national shortage of experienced doctors who could begin immediately. While Lexington argues that Ochsner's decision to hire physicians from residency programs was a business choice, Lexington does not point to evidence that there were, in fact, other physicians that Ochsner could have hired to start in February 2014 such that Ochsner could have mitigated its damages.

Thus, the Court finds that genuine disputes of material fact exist regarding whether Ochsner is entitled to the additional business interruption loss damages for the delayed start of the physicians hired from residency programs caused by the roof collapse. Lexington has not demonstrated that there are no genuine disputes of material facts here and that Lexington is entitled to summary judgment as a matter of law on this portion of Ochsner's claim for business interruption loss damages. Therefore, the Court denies Lexington's instant motion for partial summary judgment on part of Ochsner's business interruption loss claim for the damages caused by hiring physicians out of residency.[242]

### 5. Ochsner's Plan to Hire Additional Primary Care Physicians

Finally, Lexington argues that Ochsner is not entitled to recover any amount of business losses for the first year of interruption from September 2012 to September 2013.[243] Lexington asserts that Ochsner's claim is based on the assumption that the two additional physicians it hired

---

[241] Rec. Doc. 63-1 at 25.

[242] Rec. Doc. 63.

[243] Rec. Doc. 63-1 at 25.

after the new clinic opened would have been available to work during the period of indemnity as well, but that Ochsner has not produced any evidence that it would have been able to hire those two additional doctors.[244] Lexington avers that, after the collapse, Ochsner proceeded with its plans to hire three primary care physicians, and instead housed them at the main facility, and that Ochsner "was not in a position to hire any more physicians" until after the period of indemnity for reasons not related to the collapse.[245]

Lexington points to the deposition of Janie Gilberti, Ochsner's Vice President of Primary Care and Hospital Medicine, who Lexington alleges "admitted [that] she had no additional applicants to hire" and conceded that she never had to turn any physicians away or rescind any offers because of the building collapse.[246] Lexington also asserts that Ochsner's accounting expert, Frank Bocklud, testified in his deposition that he was not aware of any hiring freeze caused by the collapse.[247] Furthermore, Lexington points to the deposition testimony of Michael Hulefeld, who stated that Ochsner had only planned to hire three primary care physicians for the first year of the new clinic.[248] Lexington also points to an internal email exchange with Janie Gilberti, who said that Ochsner "did not delay any new hires because we had signed contracts" and that she did not think "we lost revenue because we were able to find a space to move the physicians."[249] Thus, according to Lexington, Ochsner could not have lost any revenue in the first year, because it fully

---

[244] *Id.*

[245] *Id.*

[246] *Id.* at 26 (citing Rec. Doc. 63-2 at 46–48, 50–51).

[247] *Id.* (citing Rec. Doc. 63-4 at 42, 45).

[248] *Id.*

[249] *Id.* at 6.

expanded its primary care practice as originally planned, despite the partial collapse of the new building.[250]

In response, Ochsner points out that Gilberti testified in her deposition that she "had to stall [her] recruitment because [she] did not have space to put physicians" after the roof collapsed on the Ochsner's new clinic.[251]  In that deposition, Gilberti further stated that she "did not rescind an offer," but that she "did not recruit, though, until [she] knew the space was going to come available." [252]  Ochsner avers that "[t]his stall meant that Ochsner suffered losses to the business."[253]  Ochsner further contends that George Panzeca, its accounting expert, determined that Ochsner "sustained a net loss during the period of interruption of September 2012 through the end of January 2014."[254]  Moreover, Ochsner points out that Hulefeld testified that he believed there was a "revenue delay" because Ochsner "didn't have the space to hire people until the building opened."[255]

Based on the conflicting evidence presented by both parties, the Court finds that genuine disputes of material fact exist regarding whether Ochsner suffered any business interruption losses for the first year of interruption. Lexington has not demonstrated that there are no genuine disputes of material facts here and that Lexington is entitled to summary judgment as a matter of law on this portion of Ochsner's claim for business interruption loss damages. To withstand this motion

---

[250] *Id.* at 3.

[251] Rec. Doc. 83 at 23; Rec. Doc. 83-13 at 8.

[252] Rec. Doc. 63-2 at 48.

[253] Rec. Doc. 83 at 24.

[254] *Id.*

[255] *Id.* at 5.

for summary judgment, Ochsner was only required to show that there is a genuine issue for trial by presenting evidence of specific facts that it suffered business interruption losses during the first year of interruption; Ochsner has done so here. Therefore, the Court denies Lexington's instant motion for partial summary judgment on part of Ochsner's business interruption loss claim for the first year of interruption.[256]

### IV. Conclusion

Based on the foregoing, the Court concludes that there are genuine disputes of material fact precluding summary judgment regarding all portions of Ochsner's claim for business interruption loss damages. The Court finds that Ochsner has presented enough evidence to create a genuine dispute of material fact regarding its "downstream revenue" damages claim, its comparison of revenues in Timeframe 1 and Timeframe 2, its "ramp up" cost damages claim, its plan to hire additional primary care physicians in the first year the clinic would have opened, and its decision to hire physicians out of residency programs. Lexington has not pointed to sufficient evidence for the Court to find that, as a matter of law, Ochsner's business interruption loss damages claim is too speculative and must be dismissed. Finally, the Court finds that the "Extended Period of Indemnity" provision allows Ochsner to assert its claim for "ramp up" cost damages such that Ochsner reaches the condition that would have existed had no loss occurred. In sum, the Court finds that there are genuine disputes of material fact for all of Ochsner's business interruption loss damages, and thus denies Lexington's instant motion for partial summary judgment.

Accordingly,

---

[256] Rec. Doc. 63.

**IT IS HEREBY ORDERED** that Lexington's "Motion for Summary Judgment on All or Certain Portions of Plaintiff's Claim for Business Interruption Damages"[257] is **DENIED**.

**NEW ORLEANS, LOUISIANA**, this __3rd__ day of January, 2017.

**NANNETTE JOLIVETTE BROWN**
**UNITED STATES DISTRICT JUDGE**

---

[257] Rec. Doc. 63.